U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| S.F., A MINOR, AND HER PARENTS | § | |
| NEXT FRIENDS, | § | |
| S.F. and S.F.  , | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 4:10-cv-323 |
| | § | |
| McKINNEY INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' COMPLAINT FOR DAMAGES,
ATTORNEY FEES, EXPENSES,
INTEREST AND COURT COSTS
PURSUANT TO 20 U.S.C. § 1415(i)(3)(B)**

Come now the Plaintiffs, S.F., a minor child with disabilities and her parents and next

friends, S.F. and S.F., by counsel, Dorene J. Philpot, and file Plaintiffs' Complaint for Damages,

Attorney Fees, Expenses, Prejudgment Interest, Post-Judgment Interest and Court Costs, plus the

costs associated with the prosecution of this complaint against McKinney Independent School

District.  In support thereof, Plaintiffs would respectfully show this Court as follows:

**I.
PRELIMINARY STATEMENT**

1.      Plaintiffs, by their attorney, bring this action to establish that Plaintiffs are the prevailing

parties in the underlying administrative proceedings, pursuant to 20 U.S.C. §

1415(i)(3)(B) of the Individuals with Disabilities Education Act ("IDEA") and are

entitled to an award of attorneys' fees and costs in connection with those administrative

proceedings.  Plaintiffs seek fees and costs incurred in successfully prosecuting a special

education due process case that was initiated by Defendant McKinney Independent

School District ("MISD"), and for which Plaintiffs raised counterclaims on which they prevailed, as well as those fees and costs incurred in filing and pursuing this action, plus any additional damages to which they may be entitled, including recovery of expenses.

## II.
## JURISDICTION

2.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that it arises under 20 U.S.C. § 1415(i)(3) of the IDEA and raises additional potential issues under other federal statutes, including but not limited to:

3.   The court also has jurisdiction pursuant to other additional federal statutes, including Section 504 and 505 of the Rehabilitation Act (29 U.S.C. § 794), the Americans with Disabilities Act (ADA), as amended by the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, *See* 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.  the Family Educational Rights Privacy Act (FERPA), 20 U.S.C § 1232g; 34 CFR Part 99, (which the IDEA incorporates by reference through 20 U.S.C.§ 1417(c), the No Child Left Behind Act (NCLBA) and Section 1983 of the Civil Rights Act of 1964 (42 U.S.C. § 1983) and Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), 29 U.S.C. § 2109, Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C § 1988, and 28 U.S.C. § 1927.

## III.
## VENUE

4.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

**IV.**
**PARTIES TO THE ACTION**

5.      Plaintiff S.F. is a minor and student with disabilities. Plaintiffs S.F. and S.F. are her

parents and next friends. At all relevant times, the official family residence has been at

2300 Hayes St., McKinney, TX 75071, and is in McKinney, Texas, within Collin

County and the boundaries of Defendant MISD.

6.      S.F. qualifies as a student with a disability under the IDEA, 20 U.S.C. § 1401(3)(A) and

34 C.F.R. § 300.8(a)(1) and under Section 504 of the Rehabilitation Act.  She is likewise

eligible for special education services under the applicable state law.  19 TEX. ADMIN.

CODE § 89.1040(c)(1).

7.      The Defendant MISD is a public school district duly organized and existing under the

laws of the State of Texas and located within Collin County, Texas.  MISD may be

served with process by serving:

      Dr. J.D. Kennedy
      Superintendent
      McKinney ISD
      One Duvall St.
      McKinney, TX 75069

and/or by serving its attorney of record in the underlying special education due process

hearing:

      Susan Graham
      Attorney-at-Law
      Walsh, Anderson, Brown, Aldridge, & Gallegos, P.C.
      505 E. Huntland Drive
      Centennial Towers, Suite 600
      Austin, Texas 78752

8.      At all times relevant herein, the Defendant is and was the Local Education Agency

legally responsible for providing a Free Appropriate Public Education ("FAPE") for S.F,

in compliance with the IDEA and the state rules and regulations promulgated by the

Texas Education Agency, from which Defendant receives funding.

## IV.
## FACTS RELATED TO UNDERLYING PROCEEDINGS

9.      On or about Oct. 2, 2009, the district, who was the aggressor in this matter, initiated a

special education due process hearing request or complaint with the Texas Education

Agency (TEA Docket # 026-SE-1009) against the family of a child with disabilities,

asking that a hearing officer be assigned to the matter and find that the evaluation

conducted by the district be deemed appropriate and that the family's request for an

independent educational evaluation be denied.

10.     In response to this aggressive action by the district against the family of a child with

disabilities, the family who could ill afford to do so was forced to defend itself retained

counsel, who reviewed the student's records and found  that the district's aggressive

action against the family was not taken with clean hands. In fact, the records revealed

numerous violations of state and federal law by MISD, and a counter-complaint was

filed by the family against the district, on Oct. 12, 2009, under the IDEA, 20 U.S.C. §§

1400-1485.

11.     The hearing officer assigned by the Texas Education Agency found in favor of the

family on the issue the district raised against the family in initiating the action, and in

addition the hearing officer found in favor of the family as to multiple issues that the

family raised in their countercomplaint against the district.

12.     As a result of the family's victory on the issue the district used as the basis for its

complaint against the family and the family's additional victory on many of the

counterissues they raised, the hearing officer appointed by the Texas Education

Agency ordered numerous remedies to compensate the student for the multiple
failures of the local education agency (LEA).

13.  The hearing officer's ordered remedies changed the legal relationship between the
parties and became an enforceable order requiring the district to change its practices as a
direct and proximate result of the hearing officer's decision.

14.  During the months between initiation of the administrative matters until hearing, counsel
for the family participated in prehearing conference calls, attended a mediation that
required many hours of travel, responded to lengthy discovery requests by the district,
filed pleadings to achieve an order from the hearing officer to allow the student's experts
to observe the school's programming after the district refused to voluntarily agree to the
observation requested by Plaintiffs, respond to briefing on statute of limitations issues,
received objections by the district to the family's request for a copy of the student's
records, reviewed more than 5,000 pages of documents, attended an ARD that was
intended to implement the hearing officer's orders against the district, participated in
multiple prehearing conferences,  interviewed and prepared potential witnesses,
interviewed and prepared expert witnesses, analyzed and researched a wide variety of
complex factual and legal issues, prepared an extensive trial plan to manage the
presentation of the hearing over the course of multiple days, traveled to and from the
hearing site, which was hundreds of miles from counsel's home and office, researched
and submitted case law and a closing brief to the hearing officer of approximately 70
pages, citing quotations from the transcript of hearing.

15.  The hearing was held on March 2, 3, 4, and 5, 2010, in McKinney, Texas.

16.  At the conclusion of the hearings and after reviewing the evidence, transcripts and
closing case law, the Hearing Officer rendered a written decision in favor of the family

on the issue raised by the district and in favor of the family on many of the issues the family raised in their countercomplaint. (See Exhibit 1, decision of hearing officer, made a part hereof and incorporated herein).

17.    In his decision issued on May 10, 2010,  the Texas Education Agency Hearing Officer ordered numerous remedies for the benefit of the student and her parents.

18.    The student in this case is deaf (known as an auditory impairment. (HO decision p. 4).

19.    Among other things, the TEA Hearing Officer found that the district had violated the disabled child's right under federal law to a Free Appropriate Public Education. 34 C.F.R. §§ 300.17, 300.324; *Tatro v. State of Texas*, 703 F.2d 832 (5th Cir. 1983), aff'd, 468 U.S. 883 (1984); *Schaffer v. Weast*, 126 U. S. 528 (2005) (See Hearing Officer Decision, Exhibit 1, attached hereto and made a part hereof.)

20.    He found in favor of the family on the school's issue and in whole or in part in regard to the family's counterclaims 1, 2, 3, 5, 9, 13 and 17. (See HO decision p. 25-40.)

21.    Issue # 1, which the hearing officer found in favor of the family on, was stated as follows: "The Respondent/Counter Petitioner's first counterclaim is that the Petitioner/Counter Respondent failed to devise appropriate IEPs for the Respondent/Counter Petitioner, resulting in a denial of FAPE and harm to the Respondent/Counter Petitioner, significantly impeding the Respondent/ Counter Petitioner's and parents' opportunity to participate in the decision-making process and/or causing a deprivation of educational benefits." (See HO decision p. 25) Respondent/Counter Petitioner prevails on Counterclaim no. 1. The Petitioner/Counter Respondent failed to devise appropriate lEPs for the Respondent/Counter Petitioner reasonably calculated to confer both academic and nonacademic benefits." (HO decision p. 28.)

22.     He found numerous problems with the student's placement and programming:

a.  He found that although "the student's mode of communication is sign language" (HO decision p. 4), the student's teacher "was not proficient in signing; she was essentially at the signing level of the student." (HO decision p. 5.)

b.  He found that "The Student's classmates in the STC were autistic children, who could not independently communicate with the student" even though the student's "IEP stated that the student would have "opportunities for direct communication with peers on the student's mode of communication: sign." (HO decision p. 9.)

c.  Because of the lack of proficiency in sign language by the teacher and the lack of deaf peers who knew sign language,  the student was not being educated in her least restrictive environment, as is required by law. The hearing officer found that "In the 2008-009 school year, the STC was not the LRE because it did not provide the Student with peers with whom the Student could communicate directly as required under state law.  In Texas, if practicable and not in conflict with an ARD committee recommendation, a deaf child must have an education in the company of a sufficient number of peers using the same language mode and with whom the child can communicate directly.27 The Student's ARD committee selected a self-contained classroom but recommended that the Student's peers be able to communicate with the Student through their acquisition of signing skills. As implemented, however, the peers were not able to and certainly did not gain signing skills to communicate directly with the Student. The special education teacher for the STC testified that none of the Student's peers could independently communicate with the Student. While the Petitioner/Counter Respondent asserts that the STC was the appropriate

LRE regardless of the other classmates not having signing ability, controlling Texas law does not qualify its mandate or provide exceptions - if there is no contrary ARD committee recommendation, which there was not in this case, schools must arrange for peers with whom the Student can communicate directly. In this case, the IEP specified that the Student would have peers to communicate with through sign language." (HO decision p. 27.)

d.  He found "The parent also asked about the signing ability of the Student's STC special education teacher and a District representative "redirected" the conversation and no one responded to the parental inquiry." (HO decision p. 9.) In addition, he found that "During ARD committee meetings over the 2008-09 school year, the Student's parents inquired several times about the level of signing ability of the Student's STC special education teacher. On those occasions of parental questions about the teacher's signing proficiency, the ARD committee conversation was "redirected" to another topic by the district." (HO decision p. 17.)

e.  He found that in the child's IEP, "There is no description of the Student's present levels of academic achievement and functional performance in the area of social skills." (HO decision p. 12.)

f.  He found that in the child's IEP, "There was no description of the student's present levels of academic achievement and functional performance in the area of independent living." (HO decision p. 13.)

g.  He found that "Among other things, the BIP [Behavioral Intervention Plan] as well as the IEP stated that the Student would be subject to the District's student code of conduct." This was inappropriate, he held as, "Subjecting the Student to regular

discipline under the District's student code of conduct is inappropriate." (HO decision p. 14.)

h. He found that, contrary to law, "The District did not issue a "prior written notice" following the Feb. 13, 2009, ARD committee meeting in regard to its refusal to change the Student's educational placement." (HO decision, p. 15.)

i. He found that, contrary to law, "The District did not supply the Student's parents with a procedural safeguards notice when it filed for this due process hearing with the TEA." (HO decision p. 20.)

j. He found that the district destroyed records that it was required to retain and then didn't inform the parent of the destruction of the records until their counsel asked about it during the due process hearing. "The district did not inform the Student's parents of the destruction of the test protocols." (HO decision p. 16.)

23.   He found numerous flaws in the evaluation of the student that was conducted by the school:

a. "The REED did not identify any specific related services requiring assessment." (HO decision p. 10.)

b. In the conducting of the district's evaluation, "only the district's primary evaluator and the Student's itinerant deaf education teacher could sign with the student." (HO decision p. 11.

c. He found that the district administered the ADOS to the student even though "The producer of the ADOS recommends that it not be administered to a child who is deaf." (HO decision p. 11.)

d.  As a whole, the hearing officer held that the district "failed to demonstrate by a

preponderance of the evidence that the administration of needed assessments was

appropriate. First, the  Petitioner/Counter Respondent inappropriately administered

an assessment. Among other things, the Petitioner/Counter Respondent used the

ADOS, an autism assessment. The Respondent/Counter Petitioner's qualified

independent evaluator - a licensed school psychologist who is also a certified

educational diagnostician as well as a certified sign language interpreter - testified

that the ADOS is not supposed to be used in evaluating children who are deaf. The

Petitioner/Counter Respondent, therefore, violated the IDEA regulation requiring

that assessments be administered according to the instructions provided by the

assessment's producer." Second, even if the utilization of the ADOS was not

contrary to its producer's instructions, it was not administered in the Student's mode

of communication - sign language. The ADOS, along with another assessment - the

VB-MAPP (a communication assessment) – were both given by evaluators who

could not sign with the Student. The Petitioner/Counter Respondent did not establish

that these evaluators had the assistance of either an interpreter or another evaluator

who could sign in the administration of these assessments. The Petitioner/Counter

Respondent, therefore, violated the Texas Education Code provision requiring

assessment "procedures and materials" for children who are deaf or hard of hearing

be in the child's "preferred mode of communication."12 This Hearing Officer

interprets this Texas provision to apply to all of the assessment material

administered to a deaf child. Here, the Petitioner/Counter Respondent failed to

demonstrate by a preponderance of the evidence that the interpretation of results and

determinations on educational needs were appropriate. The Petitioner/Counter

Respondent failed to ensure that the test protocols from the reevaluation were

documented and saved.13 The Petitioner/Counter Respondent's lead evaluator

testified that no one from the District asked for the protocols so they were destroyed.

This Hearing Officer finds that the lack of the test protocols undermines the

credibility of the Petitioner/Counter Respondent's reevaluation in light of testimony

by the Respondent/Counter Petitioner's expert that had they been available, they

would have been examined. The Respondent/Counter Petitioner was thus denied the

opportunity to explore whether the District's reevaluation was credible. The

Petitioner/Counter Respondent, therefore, violated the IDEA regulation requiring

that information obtained from all evaluation sources be documented. The

destruction of the test protocols is also a violation of the IDEA because their loss

significantly impeded the parents' opportunity to participate in the decision-making

process regarding the provision of FAPE to the Student. The underlying issue here is

not whether the Student qualifies as a child with "autism" but rather, the source,

severity and impact of certain behaviors. To properly individualize an educational

program, it is critical to correctly identify these dimensions of the challenging

behaviors of the student. On the one hand, the District sees the Student as having

problems with attending to people and "joint attention" - being able to look at or

engage with a person and focus on the same thing. If there is a lack of attending or

joint attention as attributes of autism, then the educational program should be

developed to address those needs. If instead, as suggested by the parents' private

evaluators, any lack of attention or engagement is primarily because of being in an

uncomfortable situation or frustrated by not having an opportunity to communicate with others in sign language, then the educational program should be developed to address that need.18 The parents secured two lEEs at their own expense that generated results and recommendations different from the District's reevaluation regarding the attending and joint attention problems and appropriateness of exposing the Student to a signing-rich learning environment. Without the test protocols, the parents' ability to participate in the process by exploring the accuracy of the District's reevaluation and weighing options central to the direction of the educational program are significantly impeded." (HO decision p. 24-25.)

24.     In his conclusions of law, he found that the district committed the following violations of state and federal law:

a.  The district "inappropriately evaluated" the student.

b.  The district "failed to devise appropriate IEPs" for the student.

c.  The district "failed to educate" the student in her least-restrictive environment.

d.  The district "failed to address the communication needs" of the student.

e.  The district failed in part to appropriately consider and address the needs of the student using the autism supplement.

f.  The district failed to "devise and implement an appropriate BIP" for the student.

g.  The district "failed to provide prior written notice to the parents" of the student "and this failure significantly impede the parents' opportunity to participate in the decision-makng process" for the student.

h.  The district "failed to provide the procedural safeguards notice to the parents" of the student.

      i.   The district "failed to devise appropriate measurable annual goals and objectives based on present levels of academic achievement and functional performance" for the student

(See HO decision, p. 40-42.)

25.    "The Act's procedural guarantees are not mere procedural hoops through which Congress wanted state and local educational agencies to jump.  Rather, the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decision-making." *Daniel R.R. v. State Board of Educ.,* 874 F.2nd 1041 (5th Cir. 1989).

26.    The following remedies were ordered for the multiple violations of the student's procedural and substantive rights under the law (See pages 42 and 43 of the hearing officer's attached as Exhibit 1, and incorporated herein):

1.   "The relief sought by the Petitioner/Counter Respondent shall be and is **DENIED.** The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED.** To wit, the Petitioner/Counter Respondent shall provide compensatory reimbursement to the Respondent/Counter Petitioner in the amount of $6,780.00 for the independent educational evaluations obtained by the Respondent/Counter Petitioner. This order for reimbursement of the Respondent/Counter Petitioner is stayed if a civil action is initiated in a court of competent jurisdiction to appeal the decision on this claim.

2.   The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED.** To wit, the Petitioner/Counter Respondent shall, if the Respondent/Counter Petitioner is currently a resident of the McKinney Independent School District, propose for the 2010-11 school year and be prepared to provide an IEP that includes an appropriate measurable annual goal/objective for toileting skills.

3.   The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED.** To wit, the Petitioner/Counter Respondent shall, if the Respondent/Counter Petitioner is currently a resident of the McKinney Independent School District, propose and be prepared to provide an ESY program of direct one-on-one AI services to the Respondent/Counter Petitioner. Unless an ARD committee mutually agrees otherwise, this ESY program shall be initiated as soon as practicable following the 2009-10 school year. During the course of the ESY program, the Petitioner/Counter Respondent shall provide any necessary special transportation and shall ascertain the Respondent/Counter Petitioner's present levels of academic

achievement and functional performance for presentation to an ARD committee for the Respondent/Counter Petitioner.

4. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED.** To wit, the Petitioner/Counter Respondent shall revise the 1EP and BIP of the Respondent/Counter Petitioner and no longer subject the Respondent/Counter Petitioner to the student code of conduct, unless an ARD committee mutually agrees otherwise.

5. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED.** To wit, the Petitioner/Counter Respondent shall review with and train personnel serving the Respondent/Counter Petitioner in the IDEA requirements pertaining to notice to parents of children with disabilities. The Petitioner/Counter Respondent shall develop and implement such administrative procedures as necessary to ensure required notices are timely provided to the parents.

6. The Petitioner/Counter Respondent shall timely implement this Final Decision within 10 school days in accordance with 19 Tex. Admin. Code § 89.1185(p) and 34 C.F.R. § 300.518. The Petitioner/Counter Respondent must provide the following to the Division of Complaints' Management at the Texas Education Agency and the Petitioner within 15 school days from the date of this Final Decision: (1) documentation demonstrating that the Final Decision has been implemented or (2) if the timeline set by the Hearing Officer for implementing certain aspects of the Final Decision is longer than 10 school days, the Petitioner/Counter Respondent's plan for implementing the Final Decision within the prescribed timeline and a signed assurance from the superintendent that the Decision will be implemented."

27. On 05-13-10, the family's counsel submitted a demand letter to counsel for the district in regard to the school's plan for implementing the hearing officer's orders and paying the family's prevailing party attorney fees and expenses at issue in the instant matter.

28. That no offer equal to or more generous than the hearing officer's order was ever received by Plaintiffs.

29. As of the time of filing this Complaint, Defendant has not agreed to comply with Plaintiffs' reasonable and rightful demand for payment of prevailing party attorney fees and expenses due under various state and federal laws.

30. That is matter is timely filed.

## V.
## FACTS RELATED TO ATTORNEYS' FEES

31.     Counsel for Plaintiffs, Dorene Philpot, has 10 years' experience as an attorney

        representing families of children with disabilities.  She has represented hundreds of

        parents and special needs children in administrative cases, administrative hearings

        and court cases on issues related to the IDEA, Section 504, and related state law of

        Indiana and Texas during the past decade.

32.     Philpot is one of few attorneys in the state of Texas who has any significant

        experience in special education law and, in fact, devotes her practice to this field.

        (See declaration filed simultaneously with this complaint and incorporated herein and

        made a part hereof).

33.     Counsel for Plaintiffs is one of few attorneys in the entire state of Texas who

        represent parents in special education matters on a regular basis. As the Third Circuit

        opinion in *Collingsgru v. Palmyra Board of Education*, 161 F3d 225, 236 (3rd Cir.

        1998) noted, "We acknowledge … most attorneys will be reluctant to take on cases

        like this, characterized as they are by voluminous administrative records, long

        administrative hearings and specialized legal issues…"

34.     Congress effectively made parents of children with disabilities (and their legal

        counsel) the enforcement mechanism for a child's right to FAPE.  *See Newman v.*

        *Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) ("If successful plaintiffs were

        routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a

        position to advance the public interest by invoking the . . . powers of the federal

        courts.  Congress therefore enacted the provision for counsel fees -- not simply to

        penalize litigants . . . but, more broadly, to encourage individuals . . . to seek judicial

relief."); *see also*, *Dowdell v. City of Apopka,* 698 F.2d 1181, 1191 (11th Cir. 1983)

("Attorneys' fees and expenses are awarded not only to make it possible for non-

affluent litigants to obtain legal representation, but to reward attorneys whose service

has benefitted the public interest," *citing Freeman v. Ryan,* 408 F.2d 1204, 1206

(D.C. Cir. 1968)).

35.     Ms. Philpot expended more than 350 hours representing Plaintiffs in the proceedings.

The amount of time expended by this attorney was both reasonable and necessary for a

vigorous pursuit of the student's rights. (See Billing Statement of Dorene J. Philpot filed

as exhibit 1 to declaration of Dorene Philpot and incorporated herein by reference.).

36.     The hourly rate charged in this case of $225.00 per hour for pretrial work, which

changed to a rate of $255 for pretrial work as of 01-01-10 and $285.00 per hour for

trial work for the legal services of Ms. Philpot is consistent with or lower than the

rates prevailing in  Colliln County, Texas, and surrounding areas, for the type and

quality of services furnished by attorneys of comparable skill and experience.

37.     Thus, Plaintiffs assert that a reasonable award of attorneys' fees, costs and expenses for

the services of attorney Philpot during the underlying administrative proceedings is

approximately $94,419 as of June 29, 2010 and in the amount of  approximately

$16,500 for Yvonnilda Muniz.

38.     Plaintiff additionally requests prejudgment interest on fees awarded.  Prejudgment

interest "is an element of complete compensation," *Loeffler v. Frank,* 486 U.S. 549, 558

(1988), and is "presumptively available to victims of federal law violations."  *McKnight*

*v. General Motors Corp.,* 973 F.2d 1366, 1372 (7th Cir. 1992).  See also *Carpenters*

*Dist. Council v. Dillard Dep't Stores, Inc.,* 15 F.3d 1275, 1288 (5th Cir. 1994);

*Transitional Learning Co. v. Metropolitan Life Ins.,* 913 F.Supp. 504, 508 (S.D.

Tex.1996).  Petitioners also seek post-judgment interest. Pursuant to 28 U.S.C. § 1961,

an award of post-judgment interest to the prevailing plaintiff is mandatory. *Transitional*

*Learning Community v. Metropolitan Life Ins. Co.*, 913 F. Supp. 504 (S.D. Tex. 1996).

Section 1961 provides that ""[i]nterest shall be allowed on any money judgment in a

civil case recovered in a district court." 28 U.S.C. § 1961(a); accord *Kaseman v. District*

*of Columbia,* 329 F. Supp. 2d 20, 28 (D.D.C. 2004) (finding "post-judgment interest is

appropriate when a district court enters judgment awarding reasonable attorney's fees

under the IDEA"). The Fifth Circuit has also made clear that statutory awards of

attorneys' fees should include post-judgment interest and that such interest accrues from

the date of the judgment on the merits rather than the date of the award of fees.

*Louisiana Power & Light,* 50 F.3d at 331-32.


# VI.
# FIRST CAUSE OF ACTION: IDEA

39.    Plaintiffs hereby incorporates by reference all allegations and assertions contained in

their Answer/Countercomplaint in this matter, plus all items in rhetorical paragraphs 1-

37 which are incorporated herein and further assert that Plaintiff s are a prevailing party

pursuant to the IDEA, 20 U.S.C. § 1415(i)(3)(B) and is thereby entitled to an award of

reasonable attorneys' fees and costs incurred in successfully defending against the

district's complaint against the family and also prevailing in multiple counter complaint

issues the family raised, in addition to all reasonable fees and costs incurred in initiating

and prosecuting this action.

40.     Once the court has determined that the Parents have prevailed, it then must calculate

the amount of fees and expenses which are owed to prevailing party. The calculation

of such fees, under federal fee-shifting statutes, is based upon the "lodestar." *Perdue*

*v. Kenny A.,* - U.S. -, 08-970 (April 21, 2010) at 2*. The lodestar is the number of

hours spent on the legal work in the case multiplied by a reasonable market rate in the

local area. *Id.* The court may adjust the lodestar to account for other considerations

which have not yet been figured into the computation, but this is done only in rare,

exceptional circumstances. <u>Id.</u> at 5*. In determining an award of reasonable

attorneys' fees "[t]he 'lodestar' method -reasonable hourly rates multiplied by hours

reasonably expended - is the most appropriate starting point." *People Who Care v.*

*Rockford Bd. of Educ.,* 90 F.3d 1307, 1310-11 (7th Cir. 1996) *citing Hensley,* 461

U.S. at 424. The "lodestar" figure has "become the guiding light of our fee shifting

jurisprudence" and there is a "'strong presumption' that the lodestar represents

the 'reasonable' fee." *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992);

*McNabola v. ChicagoTransit Authority,* 10 F.3d 501, 518 (7th Cir. 1993). A court

may adjust the figure upwards or downwards depending on a number of factors

commonly referred to as the *Hensley* factors. *Hensley,* 461 U.S. at 434; *People Who*

*Care*, 90 F.3d at 1310 ; *Jaffe v. Redmond,* 142 F.3d 409, 413 (7th Cir. 1998).

However, adjustments to the lodestar based on such factors should be "rare" and

reserved only for "exceptional" cases. *Perdue,* 08-970 at 2, 5*.[4] While the School

---

[4] The *Hensley* factors are: (1) the time and labor required; (2) the novelty and difficulty
of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion
of other employment by the attorney(s) due to acceptance of the case; (5) the customary fee; (6)
the nature of the fee (fixed or contingent); (7) the time limitations imposed by the client or the
circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation,

might argue that the lodestar figure should be reduced in this matter, its delay in payment of these fees and its protraction of this litigation by making it a "second major litigation" allows this Court to consider an upward adjustment in the fees and expenses sought by the Plaintiffs. *Id.* at 5* (recognizing that protracted litigation or delay in payment are legitimate grounds for upward adjustment); Hensley, 461 U.S. at 437 (hoping that a request for attorney fees will not result in a second major litigation).

41.    In determining reasonable hourly rates, attorney fee awards are to be based on market rates for services rendered. *Missouri v. Jenkins,* 491 U.S. 274, 283 (1989); *People Who Care,* 90 F.3d at 1310.

42.    Plaintiffs additionally asserts that Defendant is barred under 20 U.S.C. § 1415(i)(3) of the IDEA from raising objections to the amount and reasonableness of the fees and costs incurred in the underlying actions because the "local educational agency unreasonably protracted the final resolution of the action or proceeding or there was a violation of this section." 20 U.S.C. § 1415(i)(3)(G) and because it withheld information from the parent that it was required to give, including an appropriate evaluation, including prior written notice and including notice of procedural safeguards.

---

and ability of the attorney(s); (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) the size of the awards in similar cases, if circumstances which are not already factored into the lodestar calculation demonstrate that the resulting fee would be unreasonable. *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 564-65 (1986). However, *Perdue* updated those factors by expressly excluding upward adjustment for any factors subsumed within the initial lodestar calculation. *Perdue,* 08-970 at 5*.

43.     The costs of litigation were escalated due to the deliberate actions of Defendant, and because of this, this matter is now the second-most time-intensive (and thus second-most expensive) matter ever handled by counsel for Plaintiffs.

44.     The litigation style pursued by Defendant should not work to the detriment of Plaintiffs, especially given that Plaintiffs were vindicated in the underlying matter, as the hearing officer agreed with them that the district had violated multiple laws.

45.     While Parties against whom attorney's fee awards may be sought are not "required to yield an inch or to pay a dime not due, they may by militant resistance increase the exertions of their opponent and thus, if unsuccessful, be required to bear that cost." *McGowan v. King,* 661 F.2d 48, 51 (5th Cir. 1981).  See also *Copeland v. Marshall,* 641 F.2d 880, 904 (D.C.Cir. 1980).

46.     The Fifth Circuit has made clear that parties: "… are not required to lie supine when unmeritorious claims are presented. They are entitled to resist vigorously.  The right to determined contest, however, has a concomitant duty: an obligation to pay reasonably for the effort that a defense exacts from opposing counsel if the claim proves to be meritorious." *Knighton v. Watkins,* 616 F.2d 795, 799 (5th Cir. 1980), *rehearing denied,* 620 F.2d 300 (5th Cir. 1981);

## VII.
## SECOND CAUSE OF ACTION: ADAAA

47.     Plaintiffs incorporate rhetorical paragraphs 1 through 46 of the complaint for damages as if fully incorporated herein.

48.     The family is also seeking damages pursuant to the Americans with Disabilities Act (ADA), as amended by the Americans with Disabilities Act Amendments Act of 2008

(ADAAA), Pub. L. No. 110-325, *See* 42 U.S.C. § 12205 and 28 C.F.R. § 35.175. which clearly authorizes reimbursement for plaintiffs' litigation expenses, including expert fees.[1]

49.     The ADA authorizes a court to award attorney's fees, litigation expenses, and costs to a prevailing party. *See* 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.  The preamble to the ADA Title II regulations explains that "[l]itigation expenses include items such as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App. A, Section-by-Section Analysis, § 35.175.  Courts have interpreted the statute and its implementing regulations to include reimbursement for experts' fees.  *See, e.g., Lovell v. Chandler*, 303 F.3d 1039, 1058 (9th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003).

50.     For example, in holding that expert fees and costs are compensable under the ADA, the *Lovell* court stated:

> The ADA authorizes a court to award attorneys' fees, litigation expenses, and costs to a prevailing party. *See* 42 U.S.C. § 12205; *see also* 28 C.F.R. § 35.175. The preamble to the ADA Title II regulations explains that "[l]itigation expenses include items such as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App. A, Section-by-Section Analysis, § 35.175.  According to committee reports, Congress included the term "litigation expenses" in order to authorize a court to shift costs such as expert witness fees, travel expenses, and the preparation of exhibits. *See* H.R. Rpt. No. 101-485(III) at 73, *reprinted in* 1990 U.S.C.C.A.N. 445, 496 (Report of the Committee on the Judiciary) ("Litigation expenses include the costs of expert witnesses. This provision explicitly incorporates the phrase 'including litigation expenses' to respond to rulings of the Supreme Court that items such as expert witness fees, travel expenses, etc., be explicitly included if intended to be covered under an attorney's fee provision."); H.R. Rpt. No. 101-485(II) at 140, *reprinted in* 1990 U.S.C.C.A.N. 303, 423 (Report of the Committee on Education and Labor) ("Litigation expenses include the costs of experts and the preparation of exhibits.").

---

[1] In *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006), the court held that expert fees were not reimbursable under the IDEA.  However, the Supreme Court rested its "resolution of the question presented in th[e] case … by the fact that Congress enacted the IDEA pursuant to the Spending Clause." *Id.*  In significant contrast, the ADA was not passed pursuant to the Spending Clause and is therefore not subject to the same limitations.

*Id.* at 1058.

51.     By its own terms, the ADA retaliation provision protects "any individual" who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA. 42 U.S.C. § 12203(a). This differs from the scope of the ADA disability discrimination provision, 42 U.S.C. § 12112(a), which may be invoked only by a "qualified individual with a disability." An individual who is adjudged not to be a "qualified individual with a disability" may still pursue a retaliation claim under the ADA.

52.     In *Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469, 485-86 (6th Cir. 2005), the Sixth Circuit upheld an award of emotional distress damages under the ADA.

53.     Plaintiffs seek compensatory damages for: (1) bodily and psychological and educational  injury; (2) past and future therapeutic services, including psycho-educational, psycho-social and educational services; (3) certain non-economic damages, such as pain and suffering, loss of life's pleasures, and emotional distress. See *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992).

54.     Plaintiffs allege that, as a proximate result of the LEA's violation of the ADAAA, as well as retaliation against them, that they both suffered extreme emotional and physical distress, for which they may recover compensatory damages.

55.    Congress made clear that IDEA rights were not exclusive of those found in the ADA

or Section 504.  1986 U.S. CODE CONG. & AD. NEWS at 1805-09.[6]  The language of

20 U.S.C. § 1415 (l), and the legislative history clearly establish that the language

was intended to preserve a right to damages under the ADA and Section 504.

56.    Plaintiffs seek reimbursement of expert witness fees through the ADAAA, which

clearly authorizes reimbursement for plaintiffs' litigation expenses, including expert

fees. The ADA authorizes a court to award attorney's fees, litigation expenses, and

costs to a prevailing party. *See* 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.  The

preamble to the ADA Title II regulations explains that "[l]itigation expenses include

items such as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App. A,

Section-by-Section Analysis, § 35.175.  Courts have interpreted the statute and its

implementing regulations to include reimbursement for experts fees.  *See, e.g., Lovell*

*v. Chandler,* 303 F.3d 1039, 1058 (9th Cir. 2002), *cert. denied,* 537 U.S. 1105 (2003).

57.    For example, in holding that expert fees and costs are compensable under the ADA,
the *Lovell* court stated:

> The ADA authorizes a court to award attorneys' fees, litigation
> expenses, and costs to a prevailing party. *See* 42 U.S.C. § 12205;
> *see also* 28 C.F.R. § 35.175. The preamble to the ADA Title II
> regulations explains that "[l]itigation expenses include items such
> as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App.
> A, Section-by-Section Analysis, § 35.175.  According to
> committee reports, Congress included the term "litigation

---

6.  The House Report explicitly states that "since 1978, it has been Congress'
intent to permit parents or guardians to pursue the rights of handicapped children through
[IDEA], section 504, and section 1983…. Congressional intent was ignored by the U.S. Supreme
Court when …. it handed down its decision in *Smith v. Robinson*." H.R.Rep. No. 99-296, 99th
Cong., 1st Sess. 4 (1985). Section 1415(f) was thus enacted to "reaffirm, in light of [*Smith*], the
viability of section 504, 42 U.S.C 1983, and other statutes as separate vehicles for ensuring the
rights of handicapped children." *Id*.

expenses" in order to authorize a court to shift costs such as expert witness fees, travel expenses, and the preparation of exhibits. *See* H.R. Rpt. No. 101-485(III) at 73, *reprinted in* 1990 U.S.C.C.A.N. 445, 496 (Report of the Committee on the Judiciary) ("Litigation expenses include the costs of expert witnesses. This provision explicitly incorporates the phrase 'including litigation expenses' to respond to rulings of the Supreme Court that items such as expert witness fees, travel expenses, etc., be explicitly included if intended to be covered under an attorney's fee provision."); H.R. Rpt. No. 101-485(II) at 140, *reprinted in* 1990 U.S.C.C.A.N. 303, 423 (Report of the Committee on Education and Labor) ("Litigation expenses include the costs of experts and the preparation of exhibits."). *Id.* at 1058.

58.   *See also Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I*, 264 F.3d 999, 1011 n.4 (10th Cir. 2001) (expert fees compensable under the ADA); *Spalluto v. Trump Intern. Hotel & Tower,* 2008 WL 4525372 at 17 (S.D.N.Y. Oct. 2, 2008) (same) *Access 4 All, Inc. v. 135 West Sunrise Realty Corp.*, 2008 WL 4453221 at 15 (E.D.N.Y. Sept. 30, 2008) (same); *Raetano v. GGK, L.L.C.*, 2008 WL 2025292 at 2 (M.D.Fla. May 9, 2008) (same); *Jones v. Eagle-North Hills Shopping Centre, L.P.*, 478 F.Supp.2d 1321, 1329 (E.D. Okla. 2007) (same); *Jones v. White*, 2007 WL 2427976 at 8 (S.D.Tex. Aug. 22, 2007) (same)**;** James C. Harrington, *The ADA and Section 1983: Walking Hand in Hand,* 19 Rev. Litig. 435, 461-62 (2000) (quoting legislative history indicating Congress's intent to include the cost of expert witnesses as part of "litigation expenses").

**VIII.**
**THIRD CAUSE OF ACTION: Section 504**

59.   Plaintiffs incorporate rhetorical paragraphs 1 through 58 of the complaint for damages as if fully incorporated herein.

60.     Plaintiffs seek damages under Section 504 and 505 of the Rehabilitation Act (29

U.S.C. § 794) due to the violations of the student's and parent's legal rights that were

violated in this matter.

61.     The school failed to comply with the requirements of Section 104.33 which states that

"A recipient that operates a public elementary or secondary education program shall

provide a free appropriate public education to each qualified handicapped person who

is in the recipient's jurisdiction regardless of the nature or severity of the person's

handicap." Petitioners assert that the student's educational programming was infirm

as it did not address the student's unique and individualized needs in her least-

restrictive environment.

62.     The district violated Sec. 104.12, which requires the school to afford the student

reasonable accommodations.

63.     That the school failed to conduct an appropriate evaluation of the student,  in

violation of Section 104.35.

64.     That the school violated 34 C.F.R. 104.36, which requires districts to establish a

legally compliant system of procedural safeguards regarding evaluation.  Although a

time frame is not designated within the regulations, OCR has indicated "it is implicit

that the various steps in the (placement) process, which includes evaluation, must be

completed in a reasonable period of time." *Lumberton (MS) Pub. Schl. Dist.* 18

IDELR 33 (OCR 1991).

65.     Further, the school violated 34 C.F.R. 104.8(a), which requires a district to identify in

the notice of nondiscrimination the individual who serves as the Section 504

coordinator.  The failure to do so may constitute an actionable violation under Section

504.  *Garfield (NJ) School District,* 18 IDELR 545 (OCR 1991).  The best practice is for schools to provide the name, address and telephone number of this person. *Clarkson (NY) Cent. Sch. Dist.,* 39 IDELR 106 (OCR 2003).

66.   When evaluations of the student were done in the past for the student, they were not validated for the specific purpose for which they were used and were not administered in conformance with the instructions provided by their producer, in violation of Section 104.35(b)(1). Further, they failed to appropriately and timely assess the student in all areas of suspected disability.

67.   As a result of this, the school failed to provide appropriate services and placement to the student.

68.   That the parents were not given a meaningful opportunity to provide input into the services provided. This is contrary to 34 C.F.R 104.35(c), which requires that, in interpreting evaluation data and in making placement decisions, school districts must draw from a variety of sources.  Placement decisions must be made by a group of persons knowledgeable about the student, the meaning of the evaluation data, and placement options.  This provision has been interpreted to mean that a parent must be given a meaningful opportunity to provide input into placement decisions before they are finalized.  *Cleveland (OH) City Schl. Dist.,* 40 IDELR 185 (OCR 2003).

69.   The school violated the requirements of 104.4 (b)(1)(ii) and (iii) and (vii) which require that "the school afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others" and "provide a qualified handicapped person with an aid, benefit, or services that is not as effective as that provided to others" and "limit a qualified

handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit or service." For example, other children in the district are being taught to read, feel safe, see improvements in academics, behavior and social skills and to be around students who are their peers. Other students are allowed to make meaningful progress in those areas, but this student was not.

70.     The student was not allowed to participate to the same degree as regular education peers in extracurricular activities because the district made no effort to assist the student in communicating with teachers or peers via an interpreter or sign language. *Chesterfield Co. (Va.) Pub. Sch.,* 39 IDELR 163 (OCR 2003); *see also* 34 C.F.R. §104.37(a).

71.     The school failed to protect the student from staff who were untrained in regard to behavioral interventions, as the student's teacher could not explain why the student's behaviors were escalating as she admittedly had not received training in working with students with autism.

72.     The school failed to give a copy of Section 504 procedural rights to the family, even though they were warranted, and not even in response to a written request by their counsel to the district's counsel.

73.     The software used by the District to document the proceedings of ARD's is formatted in such as manner to render it incomprehensible to the student and the parent, thus denying an opportunity to meaningfully to participate in the process. Issues include small font, styling the student does not understand, use of

abbreviations, overuse of technical language and incoherent listing of services. This is

not an inclusive list of issues with the software.

74.     Attorney's fees are available to prevailing parents in actions brought under Section

504. 29 U.S.C.  § 794a(b). ("In any action or proceeding to enforce or charge a

violation of a provision of this subchapter, the court, in its discretion, may allow the

prevailing party, other than the United States, a reasonable attorney's fee as part of the

costs.") *See, e.g., J.C. v. Regional Sch. Dist. 10, Bd. of Educ.*, 36 IDELR 31 (2d Cir.

2002) (although the lower court based its fee award only on the IDEA claim, the 2d

Circuit extended its ruling to cover the parents' suit under Section 504); *Elliott v.*

*Board of Educ. of the Rochester City Sch. Dist.*, 40 IDELR 151 (W.D.N.Y. 2003).

75.     In *L.T., et al v. Mansfield Township School District,* 2009 U.S. Dist. LEXIS 70133,

the court noted:  "Defendant does not address, however, whether reimbursement of

expert costs is permissible for violations of the Rehabilitation Act. The Rehabilitation

Act provides, "In any action or proceeding to enforce or charge a violation of a

provision of this subchapter, the court, in its discretion, may allow the prevailing

party, other than the United States, a reasonable attorney's fee as part of the costs." 29

U.S.C. § 794a(2). Although this provision does not explicitly provide for the recovery

of expert fees as part of the costs, the Rehabilitation Act incorporates the remedies

available under the Civil Rights Act of 1964, which specifically provides for the

taxation of expert fees. See 29 U.S.C. § 794a(2) ("The remedies, procedures, and

rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)

(and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to

claims of discrimination in compensation) shall be available to any person aggrieved

by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); 42 U.S.C. § 2000e-5(k) ("[T]he court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs."). Thus, plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim. See *Neena S. ex rel. Robert S. v. School Dist. of Philadelphia*, 2009 WL 2245066, *11 (E.D. Pa. July 27, 2009) (finding that "[a]s plaintiffs were entitled to the same compensatory education under § 504 as they were awarded under the IDEA, they are prevailing parties under § 504 as well. Thus, plaintiffs are entitled to reimbursement for the evaluation under § 504 and the $ 2,475 evaluation will not be deducted from plaintiffs' requested costs."). Consequently, the Court modifies its Order of Judgment to reflect that the award of costs for plaintiffs' expert is with regard to their Rehabilitation Act claim only."

76. Section 504 of the Rehabilitation Act of 1973 provides that: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

77. Section 504 compels a school receiving any federal financial assistance under any federal program to provide a "free appropriate public education" to handicapped students within its jurisdiction. 34 C.F.R. § 104.33.

78. Plaintiff student  is an individual with a disability under the Rehabilitation Act;

79. Plaintiff is otherwise qualified for participation in the Defendant's program.

80. Plaintiff has been excluded from participation in, is being denied the benefits of or being subjected to discrimination under the program solely by reason of her disability;

81. The relevant program or activity is receiving federal financial assistance.

82. Defendant subjected Plaintiff to intentional discrimination and/or bad faith or gross misjudgment and departed grossly from accepted standards among educational professionals,. See *K.U. by and through Michael U v. Alvin Indep. Sch. Dist.,* 991 F. Supp. 599, 603 (S.D. Tex. 1998), *Monahan v. State of Nebraska,* 687 F.2d 1164, 1170-71 (8th Cir. 1982); see also *Heidemann v. Rother,* 84 F.3d 1021, 1032 (8th Cir. 1996); *Brantley v. Independent Sch. Dist. No. 625, St. Paul Pub. Sch.,* 936 F.Supp. 649, 657 (D. Minn. 1996); *Johnston v. Ann Arbor Pub. Schs.,* 569 F.Supp. 1502, 1506 (E.D. Mich. 1983).

83. Plaintiffs have made a good-faith effort to exhaust their administrative remedies by going through the IDEA hearing process and now are seeking damages on their 504 claims in this court.

84. Defendant, via its actions and inactions, subjected Plaintiffs to bad faith, gross misjudgment and deliberate indifference and therefore intentionally discriminating against the student solely on the basis of her disability and by retaliating against them for the advocacy of her rights by her family.

85. Plaintiff has already proven multiple violations of Part B of the IDEA. "… violations of Part B of the IDEA are almost always violations of the [Rehabilitation Act]"). *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3rd Cir. 2007).

86.     Damages awards are available under Section 504. *Smith v. Robinson,* 468 U.S. 992,

        1019-1020. (1984). There is no question that the State can be sued and is liable under

        Section 504 for damages where it acts with culpability characterized as "deliberate

        indifference." *E.g., Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002); *Duvall v.*

        *County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001).

87.     As a direct and proximate result of the LEA's violation of the ADAAA and Section

        504, as well as retaliation against them, that they both suffered extreme emotional and

        physical distress, for which they may recover compensatory damages.

88.     The family invokes Title II of the ADA and Section 504 of the Rehabilitation Acting,

        seeking to recover damages for the discrimination and retaliation directed at them for

        asserting their disabled child's rights.  Such damages are available under Title II,

        which incorporates by reference the remedies available under 29 U.S.C. § 794a of the

        Rehabilitation Act. *See, Ferguson v. City of Phoenix*, 157 F.3d 668 (9th Cir. 1998)

        (holding that compensatory damages are available under Title II of ADA and

        Rehabilitation Act for intentional discrimination).

89.     In *Mark H. v. Lemahieu*, 513 F.3d 922, 930 (9th Cir. 2008), the Ninth Circuit held that

        the "full panoply of remedies," with the exception of punitive damages, is available

        under Section 504.

90.     Congress's action in amending 20 U.S.C. § 1415 was intended to clarify that Section

        504 is an additional remedy not preempted by IDEA.  S. Rep. No. 99-112, at 1

        (1986), *reprinted in* 1986 U.S. CODE CONG. & AD. NEWS 1798, 1807.

91.     Section 1415(l) as amended reads as follows: "Nothing in this part shall be construed

        to restrict or limit the rights, procedures, and remedies available under the

Constitution, the American with Disabilities Act of 1990, title V of the Rehabilitation

Act of 1973, or other Federal laws protecting the rights of children with disabilities,

except that before the filing of a civil action under such laws seeking relief that is also

available under this part, the procedures under subsections (f) and (g) shall be

exhausted to the same extent as would be required had the action been brought under

this part."

92.     The district violated the student's rights under Section 504 in regard to the denial of

FAPE that occurred, the failure to educate the student in her LRE and the failure to

timely and appropriately evaluate the student in all suspected areas of disability.

93.     Section 504 requires that a district conduct child find activities, which the district

failed to do here. See 34 CFR 104.32, 20 IDELR 864 (1993), 37 IDELR 190(OCR

2002), 353 IDELR 236 (1996)

94.     In Plaintiffs' complaint, Plaintiffs seek compensatory damages for: (1)  injury; (2)

past and future therapeutic services, including psycho-educational, psycho-social and

educational services; (3) certain non-economic damages, such as pain and suffering,

loss of life's pleasures, and emotional distress.  See *Franklin v. Gwinnett County*

*Public Schools*, 503 U.S. 60 (1992).

**VIII.**
**FOURTH, FIFTH CAUSES OF ACTION:**
**42 U.S.C. § 1983 and 1988**

95.     Plaintiffs incorporate rhetorical paragraphs 1 through 94 of the complaint for

damages as if fully incorporated herein.

96.     Defendant violated Section 1983 of the Civil Rights Act of 1964 (42 U.S.C. § 1983),

which was passed as the Civil Rights Act of 1871 and which allows a private right of

action against state and local officials for federal constitutional and statutory civil rights violations. Defendant knowingly and intentionally denied the student her right to a free appropriate public education as required by the IDEA and also violated her procedural and substantive due process rights as well as equal protection rights under the Fourteenth Amendment of the U.S. Constitution.

97.    Defendant's violation of the student's rights under § 1983 were done through retaliation and willful disregard of the student's educational rights.

98.    Therefore, by adding this language, Congress made clear that IDEA rights were not exclusive of those found in the ADAAA or Section 504.

99.    The Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988, provides: "In any action or proceedings to enforce a provision of Section 1983 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. " See *Peter v. Jax*, 31 IDELR 5 (8th Cir. 1999). A person asserting prevailing party status under Section 1988 must show that he has obtained an enforceable judgment, consent decree or settlement that provides some of the legal relief sought in a Section 1983 action. *S-1 v. State Bd. of Educ. of N.C.*, 20 IDELR 1447 (4th Cir. 1994).

## VIV.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this

Court enter judgment against Defendant and grant the following relief:

a.　　　Monetary damages under any and all applicable statutes.

b.　　　Compensatory educational services under any and all applicable statutes.

c.　　　An order from the court declaring Plaintiffs the prevailing party in the underlying administrative proceedings, as the hearing officer already stated;

d.　　　An order awarding Plaintiffs reasonable attorneys' fees, expenses  and costs incurred in the administrative proceedings as well as prejudgment interest and such additional fees and costs as may have been incurred in filing and pursuing this cause of action; and

e.　　　Prejudgment and post-judgment interest.

f.　　　An order granting reimbursement of expert witness fees incurred.

## VERIFICATION

I affirm, under the penalties for perjury, that the foregoing representations are true.

Shane Fechner

Shanna Fechner

Date: ___June 29___, 2010.

Respectfully submitted,

Dorene Philpot
Counsel for Plaintiffs
Texas Attorney Number # 24055011
Philpot Law Office, P.C.
7314 Offats Pointe
Galveston, TX 77551
(281) 989-2010

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing will be served on the

following as forwarded on this 29th day of  June, 2010, via first-class mail to:

      Dr. J.D. Kennedy
      Superintendent
      McKinney ISD
      One Duvall St.
      McKinney, TX 75069

Presumed Counsel via email only and who will be asked to execute a waiver of service of
summons on behalf of her client:

      Susan Graham
      Attorney at Law
      Walsh, Anderson, Brown, Aldridge, & Gallegos, P.C.
      505 E. Huntland Drive
      Centennial Towers, Suite 600
      Austin, Texas 78752

                              _____

                              Dorene Philpot
                              Attorney at Law