

**Division of IDEA Coordination**
**1701 North Congress Avenue**
**Austin, Texas 78701-1494**
http://www.tea.state.tx.us/special.ed

**Telephone  (512) 463-9414**
**Fax  (512) 463-9560**

---

FACSIMILE MEMORANDUM
FOR ADVERSE HEARING DECISION TO LEA

Date: May 12, 2010
51 Pages, Including Co /er

---

| **School District** | **Attorney/Advocate for School District** | **Attorney/Advocate or Student** |
|---|---|---|
| McKinney ISD<br>J. D. Kennedy – Superintendent<br>Paul Foster – Sp. Ed. Director<br>Superintendent Fax: (469) 742-4071<br>Sp. Ed. Fax: (469) 742-6301 | Susan Graham<br>P. O. Box 2156<br>Austin, TX 78768<br>(512) 467-9318 | Dorene Philpot<br>7314 Offats Pointe<br>Galveston, TX 77551<br>(866) 324-4995 |

---

**From:** Cindy Swain, Manager Support Services
Division of IDEA Coordination

---

The Division of Individuals with Disabilities Education Act (IDEA) Coordination is responsible for ensuring the implementation of the hearing officer's order when it is adverse to the local education agency (LEA).

Notice:     **Notice of Special Education Due Process Hearing Decision Adverse to the LEA**
Re:           *McKinney ISD v. Shelby F., b/n/f Shane F.*
Docket #:    026-SE-1009
Date of Decision:    May 10, 2010
Documentation of Implementation Due to Division of IDEA Coordination: **15** school days from decision date

**Statement of Assurance:** For actions that will take longer than 10 school days to implement, the LEA must submit a "plan of action" within the prescribed timeline (above), that includes a signed assurance of implementation, from the superintendent.

**Important:** The LEA must **copy the Petitioner** on all correspondence related to the implementation of the decision.

**Staff Contact:** Cindy Swain, Division of IDEA Coordination
**Tel:** (512) 463-9414
**Email:** cindy.swain@tea.state.tx.us
Please contact me if you have any questions regarding this notice.

**CONFIDENTIALITY NOTICE:** This message & attached documents may contain confidential information. All information is intended only or the use of the named recipient. If you are not the named recipient, you are not authorized to read, disclose, copy, distribute, or take any action in reliance on the information. Any action other than immediate delivery to the named recipient is strictly prohibited. If you have received this message in error, do not read the information. Please immediately notify sender by telephone to arrange for a return of the original documents. If you are the named recipient, you are not authorized to reveal any of this information to any other unauthorized person. If you did not receive all pages listed or if pages are not legible, please immediately notify sender by telephone.

## TEA DOCKET NO. 026-SE-1009

| | | |
|---|---|---|
| MCKINNEY | § | |
| INDEPENDENT SCHOOL DISTRICT | § | BEFORE A |
| Petitioner/Counter Respondent | § | SPECIAL EDUCATION |
| | § | |
| v. | § | HEARING OFFICER |
| | § | |
| S. F., | § | FOR THE |
| b/n/f S. and S. F. | § | STATE OF TEXAS |
| Respondent/Counter Petitioner | § | |

## FINAL DECISION OF THE HEARING OFFICER

Appearances for Petitioner/
Counter Respondent:

Susan B. Graham
Denise Hays
Walsh, Anderson, Brown, Gallegos & Green
Austin, TX

Appearances for Respondent/
Counter Petitioner:

Dorene J. Philpot
Philpot Law Office
Galveston, TX

Yvonnilda Muñiz
Law Office of Yvonnilda Muñiz
Austin, TX

TEA DOCKET NO. 026-SE-1009

| | | |
|---|---|---|
| MCKINNEY | § | |
| INDEPENDENT SCHOOL DISTRICT | § | BEFORE A |
| Petitioner/Counter Respondent | § | SPECIAL EDUCATION |
| | § | |
| v. | § | HEARING OFFICER |
| | § | |
| S. F., | § | FOR THE |
| b/n/f S. and S. F. | § | STATE OF TEXAS |
| Respondent/Counter Petitioner | § | |

## FINAL DECISION OF THE HEARING OFFICER

### Statement of the Case

The Petitioner (District) initiated this action against the Respondent (Student)[1] under the Individuals with Disabilities Education Act (IDEA), as amended (20 U.S.C. §§ 1400 et seq.). In its single claim, the Petitioner seeks to demonstrate that its most recent evaluation of the Respondent was appropriate. As relief, the Petitioner asks that the Respondent be denied a requested independent educational evaluation (IEE) at public expense.

Upon the Petitioner's initiation of this action, the Respondent (hereinafter Respondent/Counter Petitioner) filed counterclaims under the IDEA against the Petitioner (hereinafter Petitioner/Counter Respondent). In its 18 counterclaims, the Respondent/Counter Petitioner seeks to demonstrate that the Petitioner/Counter Respondent:

1. failed to devise appropriate individualized education programs (IEPs) for the Respondent/Counter Petitioner, resulting in a denial of a free appropriate public education (FAPE) and harm to the Respondent/Counter Petitioner, significantly impeding the Respondent/Counter Petitioner's and parents' opportunity to participate in the decision-making process and/or causing a deprivation of educational benefits;
2. failed to educate the Respondent/Counter Petitioner in the least restrictive environment (LRE);
3. failed to address the Respondent/Counter Petitioner's communication needs;
4. failed to allow the parents to participate in the admission, review and dismissal (ARD) committee process;
5. failed to appropriately consider and address the Respondent/Counter Petitioner's needs using the autism supplement;
6. failed to appropriately and timely arrange a homebound program for the Respondent/Counter Petitioner;
7. failed to appropriately address the Respondent/Counter Petitioner's occupational therapy (OT) needs;
8. failed to assess and address the Respondent/Counter Petitioner's assistive technology (AT) needs;

---

[1] To protect the privacy of the Respondent, the Respondent is also referred to as "Student" in this Decision.

9. failed to conduct an appropriate functional behavioral assessment (FBA) and devise and implement an appropriate behavioral intervention plan (BIP) for the Respondent/Counter Petitioner;

10. failed to timely respond to the parents' records requests;

11. failed to timely respond to the parents' IEE request;

12. failed to offer appropriate transportation services for the Respondent/Counter Petitioner;

13. failed to provide prior written notice to the parents;

14. failed to provide appropriate extended school year (ESY) services, parent training, in-home training and parent counseling services;

15. failed to consider and use methods of instruction based on peer-reviewed research for the Respondent/Counter Petitioner;

16. failed to provide the procedural safeguards notice to the parents;

17. failed to devise appropriate measurable annual goals and objectives based on present levels of academic achievement and functional performance for the Respondent/Counter Petitioner; and

18. incurred, as a result of the alleged violations of the IDEA, the obligation to cover and reimburse the parents for privately secured services provided to the Respondent/Counter Petitioner.

As relief, the Respondent/Counter Petitioner asks that the Petitioner/Counter Respondent be directed to provide: (1) an appropriate IEP; (2) placement in an appropriate deaf education program; (3) staff training; (4) an appropriate evaluation; (5) appropriate services; (6) an aide; (7) compensatory services; (8) reimbursement of parental expenditures for private services and supplies; (9) ESY services; (10) an IEE at public expense; and (11) in the alternative, private placement at public expense.

## Procedural History

The Texas Education Agency (TEA) received the Petitioner/Counter Respondent's Due Process Complaint requesting a due process hearing on October 2, 2009. The Respondent/Counter Petitioner filed its counterclaims on October 12, 2009. On October 26, 2009, this Hearing Officer held a prehearing teleconference with the parties and, among other things, set a hearing date. Subsequently, the parties filed briefs on a request by the Respondent/Counter Petitioner to invoke exceptions under the IDEA to the statute of limitations period. Upon consideration, this Hearing Officer determined that the one-year limitations period as specified in 19 Tex. Admin. Code § 89.1151(c) would apply to the Respondent/Counter Petitioner's counterclaims.[2]

---

[2] Order on Statute of Limitations Applicable to Respondent/Counter Petitioner's Counterclaims, Dec. 17, 2009. At the beginning of the due process hearing, the Respondent/Counter Petitioner moved for reconsideration and this Hearing Officer denied the motion. Hr'g Tr. at vol. 1, pp. 40 – 41.

On December 22, 2009, the Respondent/Counter Petitioner requested a continuance of the due process hearing. Upon consideration, this Hearing Officer determined that good cause was shown and the hearing was rescheduled. On January 29, 2010, this Hearing Officer held a prehearing teleconference with the parties to resolve a discovery dispute.

The due process hearing was conducted on March 2, 3, 4, and 5, 2010. Altogether, 15 witnesses were called and testified. Altogether, 71 exhibits (either in total or in part) were admitted into evidence. During the hearing, the parties were afforded a fair opportunity to offer and solicit evidence and testimony to satisfy their burden of persuasion as assigned under *Schaffer v. Weast*, 546 U.S. 49, 57 – 58 (2005). Subsequent to the hearing, the parties were permitted to submit written closing arguments.[3]

## Findings of Fact

Based upon the testimony and evidence taken on the record in this proceeding, this Hearing Officer makes the following findings of fact:

1.  At the beginning of the 2008-09 school year, the Student was a seven-year-old child in the second grade in an elementary school in the District. The Student qualifies as a child with a disability under the IDEA. The Student is eligible for special education under the autism, hearing impairment (or auditory impairment (AI)) and speech impairment categories. (Pet'r Ex. 2 at 1 – 2; Pet'r Ex. 5 at 1; Resp't Ex. 50 at 406 – 07; Resp't Ex. 59 at 547)

2.  As a child with an auditory impairment, the Student's mode of communication is sign language; signing based on American Sign Language (ASL) is preferred. The Student does not read lips well enough to receive much information through lipreading. The District has also utilized what it has characterized as "total communication" – oral speech, visual cues and signing – as a mode of communicating with the Student. (Hr'g Tr. at vol. 2, pp. 375, 445 – 46; Hr'g Tr. at vol. 3, pp. 677, 705; Hr'g Tr. at vol. 4, pp. 881 – 84, 888 – 90, 918, 922, 936, 949; Pet'r Ex. 2 at 3; Resp't Ex. 50 at 408; Resp't Ex. 93 at 1,273; Resp't Ex. 94 at 1,283)

3.  Autism is a spectrum disorder. Children with the disorder can have a complex profile. (Hr'g Tr. at vol. 1, pp. 58, 64)

---

[3] Following the submission of posthearing briefs, the Respondent/Counter Petitioner filed a motion to strike the Petitioner/Counter Respondent's brief as untimely. Upon consideration, this Hearing Officer finds that the Petitioner/Counter Respondent's brief was filed three minutes late and that this delay was de minimis and therefore the Respondent/Counter Petitioner's motion is denied. Following the submission of posthearing briefs, the decision due date was extended upon motion for good cause shown until May 10, 2010.

4.    The Student's placement for the 2008-09 school year was a "structured teaching classroom" (STC) – a self-contained class with three other children, all of whom have autism. A special education teacher and two paraprofessionals provided full-time instruction and support in the STC. An itinerant deaf education teacher also provided AI services to the Student in the STC in accordance with the Student's IEP. (Hr'g Tr. at vol. 4, pp. 976 – 77, 1,129, 1,188 – 89)

5.    The Student's placement included an opportunity to attend a general education art class for one hour a week. (Hr'g Tr. at vol. 4, pp. 1,046, 1,153; Pet'r Ex. 2 at 49; Resp't Ex. 50 at 442)

6.    The STC special education teacher was not proficient in signing; she was essentially at the signing level of the Student. Using total communication, the teacher was able to communicate with the Student. (Hr'g Tr. at vol. 4, pp. 1,157 – 58)

7.    The Student's classmates in the STC were autistic children who could not independently communicate with the Student. The STC staff, however, could sometimes prompt the classmates to "mimic" what the staff said to the Student. (Hr'g Tr. at vol. 4, p. 1,189)

8.    The Student's IEP in effect at the beginning of the 2008-09 school year was mostly developed at an ARD committee meeting on February 15, 2008. Among other things, that ARD committee developed annual goals in the following five areas: academics; social skills; communication; self-help skills; and behavior. (Hr'g Tr. at vol. 4, pp. 949 – 50, 1,129; Pet'r Ex. 2 at 13 – 24)

9.    At the beginning of the 2008-09 school year, the Student's IEP academics goal was: "[The Student] will improve . . . academic skills as demonstrated by mastery of the following objectives." Nine objectives were listed on the academics IEP; each objective had "level of mastery criteria" stated. The Student's present levels of academic achievement and functional performance in the area of academics were described as "requires content modifications" in reading, language, social studies, math, science and electives. The Student's present levels of academic achievement and functional performance in the area of academics were also stated as: "[The Student] has shown that [the Student] can write both fill in missing letters [sic] of . . . name and write . . . name with a model but does not demonstrate this skill consistently. [The Student] can also sort objects by the colors yellow, red, blue and green and match them to the color word written in black. [The Student] can also expressively lable [sic] colors but does not

demonstrate this skill consistently." (Hr'g Tr. at vol. 3, p. 720 – 21; Pet'r Ex. 2 at 3, 13 – 15; Resp't Ex. 50 at 408)

10.   At the beginning of the 2008-09 school year, the Student's IEP social skills goal was: "[The Student] will improve . . . social skills as demonstrated by mastery of the following objectives." Four objectives were listed on the social skills IEP; each objective had "level of mastery criteria" stated. Among the objectives was that the Student would "play interactively with peers." The Student's present levels of academic achievement and functional performance in the area of social skills were stated as: "[The Student] will accept toys from peers and will give a peer a toy when they request it from [the Student] using sign with prompting. [The Student] also can sit appropriately in a small group 1:2 for 5 minutes while keeping . . . hands and feet to [self] when engaged in the group activity. [The Student] will also physically prompt others to do a specific activity independently (help [the Student] with a straw, hold hands, help . . . cut with scissors, etc.)." (Hr'g Tr. at vol. 3, p. 721; Pet'r Ex. 2 at 16 – 17)

11.   At the beginning of the 2008-09 school year, the Student's IEP communication goal was: "[The Student] will improve . . . communication skills as demonstrated by mastery of the following objectives." Six objectives were listed on the communication IEP; each objective had "level of mastery criteria" stated. The Student's present levels of academic achievement and functional performance in the area of communication were described as "Student has communication needs which should be addressed through supplementary aids and services, IEP, AT, and/or speech therapy" as well as "Student is Auditorially Impaired/Deaf. Direct instruction in student's mode of communication: total communication (sign). Opportunities for direct communication with peers in student's mode of communication: sign." The Student's present levels of academic achievement and functional performance in the area of communication were also stated as: "[The Student] can follow instructions to do an enjoyable action in context with a model. [The Student] can draw, roll a car, and play imitation games. [The Student] can also select a reinforcing item from an array of 2-3. [The Student] can also follow instructions to touch [the Student's] own parts (nose, eye, mouth, elbow, head, neck, knee, foot, ear and tummy). [The Student] can also imitate motor movements and motor movement with objects using both [the Student's] upper body and lower body extremities when instructed to do so. This includes head, mouth and tongue movements. [The Student] will also occassionally [sic] spontaneously imitate the actions of others." (Hr'g Tr. at vol. 3, p. 721; Pet'r Ex. 2 at 3, 18 – 20; Resp't Ex. 50 at 408)

12.  At the beginning of the 2008-09 school year, the Student's IEP self-help skills
     goal was:   "[The Student] will increase . . . independent living skills as
     demonstrated by mastery of the following objectives." Six objectives were listed
     on the self-help skills IEP; each objective had "level of mastery criteria" stated.
     The attainment of toileting skills was not among the self-help objectives; this
     objective was in previous IEPs but was dropped because the Student had
     developed several urinary tract infections and no doctor's note had yet been
     received permitting the resumption of this objective. The Student's present levels
     of academic achievement and functional performance in the area of self-help
     skills were stated as: "[The Student] can occassionally [sic] pull [the Student's]
     pants/[clothing] up and down independently as well as put . . . shoes on a [sic] tie
     them. [The Student] has also demonstrated the ability to feed [self] finger foods
     as well as food items that require the use of a spoon or fork, but [the Student]
     often requires prompting.    [The Student] can also wash and dry hands
     independently but does not consistently demonstrate independence with this skill
     and often requires physical prompting." (Hr'g Tr. at vol. 3, p. 709; Hr'g Tr. at
     vol. 4, pp. 956, 1,130 – 31; Pet'r Ex. 2 at 21 – 22)

13.  At the beginning of the 2008-09 school year, the Student's IEP behavior goal was:
     "[The Student] will make measurable progress on . . . BIP IEPs as demonstrated
     by mastery criteria [sic] as stated below." Four objectives were listed on the
     behavior IEP; each objective had "level of mastery criteria" stated. The Student's
     present levels of academic achievement and functional performance in the area of
     behavior were described as "The student's behavior impedes his/her learning or
     the learning of others." The Student's present levels of academic achievement
     and functional performance in the area of behavior were also stated as: "[The
     Student] can complete matching tasks & puzzles 80% to 90% without
     maladaptive behaviors occuring [sic]." (Hr'g Tr. at vol. 4, p. 1,095; Pet'r Ex. 2 at
     3, 23 – 24; Resp't Ex. 50 at 408)

14.  The Student's IEP in effect at the beginning of the 2008-09 school year also
     included an FBA and BIP that were developed at an ARD committee meeting on
     February 15, 2008. The FBA assessed three problem behaviors:   (1) "[The
     Student] engages in aggression to others in the form of hitting, biting, scratching,
     pinching, and kicking;" (2) "Nonaggressive actions in the form of falling to the
     floor, spitting, refusal to work without prompts from an adult, and throwing or
     destroying property;" and (3) "Inappropriate actions in the form of putting [the
     Student's] hands or items/food in pants/clothing of self of [sic] others." The BIP
     prescribed both proactive antecedent interventions as well as procedures to apply
     after the Student had engaged in a targeted behavior. Among other things, the
     BIP called for teaching replacement behaviors such as "teaching [the Student] to

enjoy social interactions or other activities that result in an abundance of social reinforcement." The IEP, in regard to behavior, stated that the Student would be subject to the District's student code of conduct. (Hr'g Tr. at vol. 4, pp. 954 – 55, 1,086 – 94; Pet'r Ex. 2 at 3, 26 – 37; Resp't Ex. 50 at 408, 419 – 30)

15. The Student's IEP in effect at the beginning of the 2008-09 school year also included an autism supplement that was completed at an ARD committee meeting on February 15, 2008. The autism supplement, among other things, specified that the Student did not need in-home training. The autism supplement also indicated that the Student's parents declined parent training. The autism supplement also indicated that the Student needed extended educational programming. (Hr'g Tr. at vol, 3, p. 711, 713 – 14, 826 – 27; Hr'g Tr. at vol, 4, pp. 959 – 60, 963 – 65; Pet'r Ex. 2 at 25, 40 – 41, 69; Resp't Ex. 50 at 433 – 34, 449)

16. The Student's parents declined parent training because they did not agree with the training offered; they indicated no interest in requesting different training. If offered, the parents would not have accepted in-home training. (Hr'g Tr. at vol. 3, pp. 753, 756, 788, 829 – 30)

17. The Student's IEP in effect at the beginning of the 2008-09 school year provided for both direct and consultative AI services for the Student by a certified itinerant deaf education teacher fluent in sign language. The amount of direct AI services was 2,400 minutes every 9 weeks (approximately one hour per school day); the amount of consultative AI services was 11 hours for the year. The itinerant deaf education teacher taught and instructed the Student using ASL as well as Signed Exact English (SEE). (Hr'g Tr. at vol. 4, pp. 967 – 68, 1,128 – 29, 1,132, 1,134 – 35, 1,157; Pet'r Ex. 3 at 1, 4)

18. The itinerant deaf education teacher and the STC special education teacher collaborated on skills and the Student's goals. The itinerant deaf education teacher trained the STC special education teacher in signing. (Hr'g Tr. at vol. 4, p. 1,145)

19. The Student's IEP in effect at the beginning of the 2008-09 school year provided for the related service of special transportation for the Student. (Pet'r Ex. 2 at 49; Resp't Ex. 50 at 442)

20. The Student's IEP in effect at the beginning of the 2008-09 school year addressed the Student's AT needs by specifying that the Student would not wear either hearing aids or an FM system per parental request. The District honored the

parental request. (Hr'g Tr. at vol. 2, pp. 377 – 78, 517; Hr'g Tr. at vol. 3, pp. 706 – 08; Hr'g Tr. at vol. 4, p. 959; Pet'r Ex. 2 at 4, 68; Resp't Ex. 50 at 409, 450)

21.   In the STC, the Student had access to and utilized a computer as part of instruction. (Hr'g Tr. at vol. 2, p. 323; Hr'g Tr. at vol. 4, pp. 1,002 – 03, 1,151 – 53; Resp't Ex. 71 at 803)

22.   The Student's IEP in effect at the beginning of the 2008-09 school year addressed the Student's communication needs. Among other things, the IEP stated that the Student would have "opportunities for direct communication with peers in student's mode of communication: sign." (Pet'r Ex. 2 at 3; Resp't Ex. 50 at 408)

23.   The Student's parent participated in a "meet the teacher night" at the beginning of the 2008-09 school year. The parent met the Student's STC special education teacher and asked the teacher about her signing ability. The teacher replied that she knew "basic sign." (Hr'g Tr. at vol. 4, pp. 1,165, 1,191 – 93)

24.   On October 3, 2008, the District held an ARD committee meeting for the Student. The Student's parent was in attendance and participated. Among other things, the District determined that a reevaluation of the Student was warranted. At the meeting the District conducted a review of existing evaluation data (REED) on the Student and further identified areas needing assessment; the parent requested an IEE. The District responded that the reevaluation would first be completed and then if the parent disagreed with the completed reevaluation the parent could request an IEE. The parent provided consent for the reevaluation. The parent also asked about the signing ability of the Student's STC special education teacher and a District representative "redirected" the conversation and no one responded to the parental inquiry. The parent declined a copy of the IDEA procedural safeguards notice. (Hr'g Tr. at vol. 1, pp. 52 – 54, 236 – 37; Hr'g Tr. at vol. 3, pp. 799, 814; Hr'g Tr. at vol. 4, pp. 985 – 86, 1,191 – 92; Pet'r Ex. 5 at 1 – 3, 8 – 15; Resp't Ex. 59 at 547 – 49, 551 – 52, 556 – 59, 566)

25.   On or about October 15, 2008, the Student's parents renewed their request for an IEE on the grounds that they disagreed with the reevaluation of the Student conducted in April, 2006 while the Student attended the Plano Regional Day School for the Deaf. The 2006 reevaluation was conducted by Plano Independent School District, which hosts this Regional Day School for the Deaf. (Hr'g Tr. at vol. 1, pp. 50, 235; Hr'g Tr. at vol. 3, p. 634; Hr'g Tr. at vol. 4, p. 1224; Resp't Ex. 61, p. 570)

26. On or about October 27, 2008, the District reiterated its position in a letter to the Student's parents that an IEE "would not be appropriate at this time" because of its reevaluation of the Student. The District explained that if the parent later disagreed with the completed reevaluation the parent could request an IEE. (Hr'g Tr. at vol. 1, pp. 239 – 40; Resp't Ex. 61, p. 575 – 76)

27. On December 5, 2008, the District held an ARD committee meeting for the Student at parental request. The Student's parent was in attendance and participated. Among other things, the District reviewed and revised its REED and reevaluation plan for the Student. The parent provided consent for the reevaluation. The IDEA procedural safeguards were reviewed with the parent; the parent declined a copy of the IDEA procedural safeguards notice. (Hr'g Tr. at vol. 1, pp. 54 – 56; Hr'g Tr. at vol. 3, pp. 730 – 31, 733; Hr'g Tr. at vol. 4, pp. 994 – 95; Pet'r Ex. 8 at 1 – 2, 4 – 6; Pet'r Ex. 9 at 1; Resp't Ex. 64 at 606 – 07, 609, 618)

28. The December 5, 2008 ARD committee's REED stated, in part: "Informal and formal assessment will be conducted to address cognitive, achievement, language and autism spectrum disorder." Among other things, the REED specifically addressed AT and stated: "Informal assessment to be completed to assess current assistive technology needs." The REED did not identify any specific related services requiring assessment. (Hr'g Tr. at vol. 1, p. 54 – 55; Hr'g Tr. at vol. 3, pp. 731 – 33; Hr'g Tr. at vol. 4, pp. 995 – 96; Pet'r Ex. 8 at 5)

29. An OT assessment was not indicated as the Student possessed fine motor skills with no indication of lost or impaired functions. (Hr'g Tr. at vol. 3, p. 819; Hr'g Tr. at vol. 4, pp. 932, 996)

30. The District's reevaluation of the Student was conducted over three months, beginning in December, 2008 and concluding in February, 2009. (Hr'g Tr. at vol. 1, p. 57; Pet'r Ex. 12 at 1 – 2; Resp't Ex. 67 at 675 – 76, 706 – 07)

31. The District retained an outside consultant – Dr. Althea Schoenfeldt – to serve as the primary evaluator in the reevaluation of the Student. The District's retained primary evaluator is proficient in sign language and certified as an educational diagnostician. (Hr'g Tr. at vol. 1, pp. 57, 106 – 07; Hr'g Tr. at vol. 2, pp. 500 – 01)

32. The District used a team of seven evaluators for the reevaluation of the Student: the District's retained primary evaluator, the Student's itinerant deaf education teacher, a District-employed licensed specialist in school psychology (LSSP), a

District-employed speech-language pathologist, a District-employed behavior analyst and two of the District's educational diagnosticians from its autism evaluation team; one of the educational diagnosticians is also a speech-language pathologist. Of these evaluators, only the District's retained primary evaluator and the Student's itinerant deaf education teacher could sign with the Student. (Hr'g Tr. at vol. 1, pp. 49, 56 – 57, 87, 97 – 98, 110 – 11, 175; Hr'g Tr. at vol. 4, p. 948; Pet'r Ex. 12 at 1 – 2, 33)

33.    Several formal assessments were administered to the Student.    The Developmental Test of Visual-Motor Integration was administered by the District's retained primary evaluator. The Assessment of Basic Language and Learning Skills – Revised (ABLLS) was administered by the Student's itinerant deaf education teacher and the District's behavior analyst.    The Cottage Acquisition Scales for Listening, Language and Speech was administered by the Student's itinerant deaf education teacher. The Test for Auditory Comprehension of Language 3 was administered by the District's retained primary evaluator. The Expressive One-Word Vocabulary Test was administered by the District's retained primary evaluator.    The SKI-HI Language Development Scale was administered by the Student's itinerant deaf education teacher.    The Autism Diagnostic Observation Schedule (ADOS) was administered by two of the District's educational diagnosticians from the autism evaluation team. The Leiter International Performance Scale was administered by the District's retained primary evaluator. The Bracken Basic Concept Scale was administered by the District's retained primary evaluator.    The writing samples subtest of the Woodcock-Johnson Tests of Achievement-III was administered by the District's retained primary evaluator. The Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP) was administered by the District's behavior analyst. In addition, evaluation material such as observations (e.g., school and home), questionnaires (e.g., Short Sensory Profile) and rating scales (e.g., the Childhood Autism Rating Scale) were collected by the evaluation team as part of the reevaluation. (Hr'g Tr. at vol. 1, pp. 57 – 58, 87; Pet'r Ex. 12 at 1 – 2; Resp't Ex. 67 at 675 – 76, 706 – 07)

34.    The District interpreted the results of the ADOS as indicating that the Student's autism is "significant." (Hr'g Tr. at vol. 1, pp. 57 – 63, 87 – 88; Pet'r Ex. 12 at 14, 17 – 19, 34; Resp't Ex. 67 at 687, 690 – 92, 719, 722 – 24; Resp't Ex. 68 at 739)

35.    The producer of the ADOS recommends that it not be administered to a child who is deaf. (Hr'g Tr. at vol. 2, pp. 467 – 68)

36.    On February 13, 2009, the District held an ARD committee meeting for the
       Student. The Student's parents were in attendance and participated. Among other
       things, the committee conducted the annual review of the Student's IEP. The
       District adopted IEP annual goals effective until February 12, 2010 in the
       following seven areas: academics; language arts; social skills; mathematics;
       communication; independent living skills; and adaptive behavior. (Hr'g Tr. at
       vol. 4, pp. 1,004 – 10, 1,170 – 71; Pet'r Ex. 11 at 1 – 15; Resp't Ex. 65 at 630 –
       45)

37.    For the remainder of the 2008-09 school year, the Student's IEP academics goal
       was: "[The Student] will increase mastery of academic skills as demonstrated by
       meeting the objectives [sic] below." One objective was listed on the academics
       IEP; the objective had "mastery criteria" stated. The Student's present levels of
       academic achievement and functional performance in the area of academics were
       described as "Reading: 1) Reading color words (with no visual): Black, Blue,
       Brown, Green, Orange, Purple, Red, White, Yellow; 2) Recognizing/identifying
       her name (in a field of 3); and 3) Filling in and forming 3-letter words when given
       a model and only the letters of the word, no extra letters." (Hr'g Tr. at vol. 2, pp.
       575 – 76; Pet'r Ex. 11 at 2, 7; Resp't Ex. 65 at 631, 637)

38.    For the remainder of the 2008-09 school year, the Student's IEP language arts
       goal was:    "[The Student] will increase mastery of language art skills as
       demonstrated by meeting the objectives below." Five objectives were listed on
       the language arts IEP; the objectives had "mastery criteria" stated. The Student's
       present levels of academic achievement and functional performance in the area of
       language arts were described as "Written expression: 1) Writing . . . first and last
       name with a model. Emerging: 1) Writing . . . first and last name with no model
       (when given sign directions only); 2) Writing the alphabet." (Hr'g Tr. at vol. 2, p.
       576; Hr'g Tr. at vol. 4, pp. 1,006 – 07; Pet'r Ex. 11 at 4, 8; Resp't Ex. 65 at 638)

39.    For the remainder of the 2008-09 school year, the Student's IEP social skills goal
       was: "[The Student] will increase mastery of social skills as demonstrated by
       meeting the objectives below." Two objectives were listed on the social skills
       IEP; the objectives had "mastery criteria" stated. Among the objectives was that
       the Student would "allow a peer to hold [a] hand or assist [the Student] in some
       manner for at least 30 seconds." There was no description of the Student's
       present levels of academic achievement and functional performance in the area of
       social skills. (Hr'g Tr. at vol. 2, pp. 576 – 77; Hr'g Tr. at vol. 4, pp. 1,009 – 10;
       Pet'r Ex. 11 at 9; Resp't Ex. 65 at 639)

40.   For the remainder of the 2008-09 school year, the Student's IEP mathematics goal
      was: "[The Student] will increase mastery of mathematics skills as demonstrated
      by meeting the objectives below." Two objectives were listed on the mathematics
      IEP; the objectives had "mastery criteria" stated. The Student's present levels of
      academic achievement and functional performance in the area of mathematics
      were described as "Math: 1) Tracing numbers in order from 1-3; 2) Counting
      manipulative #'s 1-3. Emerging: 1) Filling in (both signing & writing it on
      paper) the missing # when given 1, 2, __; 2) Recognizing the numbers & giving
      the sign when shown the number on a card (#'s 1-5)." (Hr'g Tr. at vol. 2, pp. 577
      – 78; Hr'g Tr. at vol. 4, p. 1,007; Pet'r Ex. 11 at 4, 10; Resp't Ex. 65 at 640)

41.   From the February, 2009 ARD committee meeting until the next ARD committee
      meeting, the Student's IEP communication goal was:     "[The Student] will
      increase mastery of communication skills as demonstrated by meeting the
      objectives below." Nine objectives were listed on the communication IEP; the
      objectives had "mastery criteria" stated. The Student's present levels of academic
      achievement and functional performance in the area of communication were
      described by listing the mastered and emerging sign vocabularies of the Student
      by expressive language and receptive language. (Hr'g Tr. at vol. 4, pp. 1,007 –
      08; Pet'r Ex. 11 at 3 – 4, 11; Resp't Ex. 65 at 632, 641)

42.   For the remainder of the 2008-09 school year, the Student's IEP independent
      living goal was: "[The Student] will increase mastery of independent living skills
      as demonstrated by meeting the objectives below." Five objectives were listed on
      the independent living IEP; the objectives had "mastery criteria" stated. The
      attainment of toileting skills was not among the independent living objectives.
      There was no description of the Student's present levels of academic achievement
      and functional performance in the area of independent living. (Hr'g Tr. at vol. 2,
      pp. 579 – 80; Hr'g Tr. at vol. 4, pp. 1,008 – 09; Pet'r Ex. 11 at 13; Resp't Ex. 65
      at 643)

43.   For the remainder of the 2008-09 school year, the Student's IEP adaptive
      behavior goal was: "[The Student] will increase mastery of adaptive behavior
      skills as demonstrated by meeting the objectives below." Three objectives were
      listed on the adaptive behavior IEP; the objectives had "mastery criteria" stated.
      The Student's present levels of academic achievement and functional
      performance in the area of adaptive behavior were described as "Current
      behavior:  1) Enjoys computer time (& can sit independently w/out any
      disruptions for periods of time); 2) Follow 1-step directions during table work; 3)
      Non-aggressive behaviors such as pouring out contents of manipulatives in
      buckets to avoid task demand; and 4) Aggressive behaviors such as scratching

others. Emerging behavior: 1) Beginning to feed [self] with more independence. Previous behavior: 1) [The Student] has NO [sic] indications currently of engaging in aggression to others in the form of biting, pinching and/or kicking to [sic] either peers or adults; 2) [The Student] has NO [sic] indications of currently engaging in nonaggression in the form of falling to the floor and/or spitting." (Hr'g Tr. at vol. 4, pp. 1,009 – 10; Pet'r Ex. 11 at 4, 14; Resp't Ex. 65 at 644)

44.    An FBA and BIP were developed at the ARD committee meeting on February 13, 2009. The FBA assessed four problem behaviors: (1) "disruption of classroom;" (2) "physical aggression;" (3) "task refusal;" and (4) "refusal to follow adult directions." Among other things, the FBA noted: "[The Student] has made tremendous gains in the area of problem behavior reduction." The BIP prescribed both pro-social replacement behaviors as well as procedures to apply after the Student had engaged in a targeted behavior. Among other things, the BIP as well as the IEP stated that the Student would be subject to the District's student code of conduct. (Hr'g Tr. at vol. 4, pp. 1,016, 1,095 – 1,100, 1,114 – 15; Pet'r Ex. 11 at 5, 27 – 35; Resp't Ex. 65 at 635, 666 – 70)

45.    Although the Student's at-school behaviors had improved at this juncture of the 2008-09 school year, the Student nonetheless still had "significant maladaptive behaviors." The Student's parents reported observing new maladaptive behaviors at home. (Hr'g Tr. at vol. 4, pp. 1,096 – 97, 1,101; Pet'r Ex. 11 at 22; Resp't Ex. 65 at 652)

46.    Subjecting the Student to regular discipline under the District's student code of conduct is inappropriate. (Hr'g Tr. at vol. 2, p. 572; Hr'g Tr. at vol. 4, p. 1,115)

47.    An autism supplement was developed at the ARD committee meeting on February 13, 2009. The autism supplement, among other things, stated that the ARD committee would determine extended educational programming at a later date. The autism supplement also indicated that the Student did not need in-home training. The autism supplement also indicated that the Student's parents declined parent training. The autism supplement also indicated that the District used strategies based on peer-reviewed research in educating the Student in the STC placement. (Hr'g Tr. at vol. 4, pp. 1,016 – 19; Pet'r Ex. 11 at 36 – 39; Resp't Ex. 65 at 662 – 63)

48.    For the remainder of the 2008-09 school year, the Student's IEP provided for direct AI services for the Student by a certified itinerant deaf education teacher fluent in sign language. The amount of direct AI services was 2,400 minutes

every 9 weeks (approximately one hour per school day). (Pet'r Ex. 11 at 20; Resp't Ex. 65 at 650)

49.    For the remainder of the 2008-09 school year, the Student's IEP provided for the related service of special transportation for the Student. Special transportation was implemented without any problems during the school year. (Hr'g Tr. at vol. 3, pp. 693, 743 – 44, 802; Pet'r Ex. 11 at 20, 24 – 25; Resp't Ex. 65 at 650, 672 – 73)

50.    The February 13, 2009 ARD committee also discussed the Student's needs for AT devices and services. The District determined that the Student did not need any AT devices or services other than such items as daily picture schedules and cards as visual cues. (Hr'g Tr. at vol. 2, pp. 573 – 75, 580 – 82; Hr'g Tr. at vol. 4, pp. 932 – 33; Pet'r Ex. 11 at 6, 15; Resp't Ex. 65 at 636, 645)

51.    The February 13, 2009 ARD committee also discussed the Student's parents' request for placement of the Student in a deaf education program. The District responded to the parental request for change of placement and denied it. The parent declined a copy of the IDEA procedural safeguards notice. The parents disagreed with the decisions of the District at the February 13, 2009 ARD committee meeting. (Hr'g Tr. at vol. 4, p. 1,010 – 12; Pet'r Ex. 11 at 23, 42; Resp't Ex. 65 at 654 – 55)

52.    The District did not issue a "prior written notice" following the February 13, 2009 ARD committee meeting in regard to its refusal to change the Student's educational placement. (Hr'g Tr. at vol. 4, pp. 1,015 – 16)

53.    On February 27, 2009, the reevaluation report – labeled "Full Individual Evaluation" – was completed. (Pet'r Ex. 12; Resp't Ex. 67)

54.    The District interpreted the results of its reevaluation as indicating that autism is the primary disability interfering with the Student's education. In particular, the District interpreted the results of its reevaluation as indicating that the Student has challenges with "joint attention" – being able to look at or engage with a person and focus on the same thing – and avoidant behavior. (Hr'g Tr. at vol. 1, pp. 63, 76 – 77, 114, 124 – 25, 134, 138 – 40, 145 – 47, 153 – 55; Pet'r Ex. 12 at 28, 32)

55.    Among other things, the reevaluation report addressed AT and stated: "The need for assistive technology has been informally evaluated through observation, teacher reports, and parent report. [The Student] currently uses picture [sic] and some signs to access information in [the Student's] environment." The report

further stated: "Recommendations to enable the student to benefit from special education, and to advance appropriately toward attaining the annual goal(s): picture schedule, pictures to access information in [the Student's] environment." Among other things, the report recommended that "[The Student] would benefit by daily work on the computer to increase [the Student's] comfort with it, as well as its use as a teaching tool." (Hr'g Tr. at vol. 1, pp. 73 – 74; Pet'r Ex. 12 at 28; Resp't Ex. 67 at 701, 733)

56.     Among other things, the reevaluation report noted "toileting" as among the Student's weaknesses in the area of adaptive behavior. (Pet'r Ex. 12 at 22; Resp't Ex. 67 at 695, 727)

57.     The District had an informal meeting with the parents to review the reevaluation report in March, 2009. (Hr'g Tr. at vol. 3, pp. 739 – 40)

58.     Test protocols are the test booklets with the recordings of responses or scores and results from the assessments administered to the Student during the reevaluation. The District did not request retention of the test protocols from the reevaluation and the District's retained primary evaluator destroyed them. The District did not inform the Student's parents of the destruction of the test protocols. (Hr'g Tr. at vol. 1, pp. 163 – 65, 471; Hr'g Tr. at vol. 4, pp. 911 – 12)

59.     The Student's parents retained an independent school psychologist. The independent school psychologist would have reviewed the test protocols from the reevaluation had they been available. (Hr'g Tr. at vol. 2, pp. 480, 526 – 27)

60.     On May 8, 2009, the District held an ARD committee meeting for the Student. The Student's parent was in attendance and participated. Among other things, the committee revised by mutual agreement two objectives for the Student's IEP communication goal. (Hr'g Tr. at vol. 4, p. 1,026; Pet'r Ex. 13 at 9; Resp't Ex. 70 at 756)

61.     The May 8, 2009 ARD committee also reviewed the February, 2009 reevaluation report. The parent disagreed with the reevaluation and the District's proposal to continue the Student's placement in the STC classroom. The parent did not request an IEE at public expense at this meeting. (Hr'g Tr. at vol. 4, pp. 1,025 – 28; Pet'r Ex. 13 at 20 – 21; Resp't Ex. 70 at 767 – 68)

62.     The May 8, 2009 ARD committee also discussed ESY services for the Student. The District recommended ESY services. The parent requested additional information about the ESY teacher who would be assigned to the Student. The

committee recessed the meeting until May 19, 2009. (Hr'g Tr. at vol. 3, p. 618; Pet'r Ex. 13 at 21, 24; Resp't Ex. 70 at 768, 771)

63.     On May 19, 2009, the District resumed an ARD committee meeting for the Student. The Student's parents were in attendance and participated. Among other things, the committee continued discussion of ESY services for the Student. The District proposed that the Student be provided ESY services for three hours a day for four days a week over five weeks. The District proposed that AI services would account for one and one-half hours per week of the ESY program; "structured teach" services would account for the remainder of the ESY program. The parents expressed disagreement with the ESY proposal because the amount of proposed AI services was not commensurate with the intensity of AI services during the school year. The parents declined ESY for summer, 2009. The parents disagreed with the proposed continued placement of the Student in the STC. At the ARD committee meeting the parents disagreed with the decisions of the District. (Hr'g Tr. at vol. 3, pp. 618 – 19, 640 – 41, 698 – 99; Hr'g Tr. at vol. 4, pp. 1,028 – 29; Pet'r Ex. 13 at 21 – 22, 24; Resp't Ex. 70 at 768 – 69, 771)

64.     The District provided a prior written notice to the Student's parents following the May 19, 2009 ARD committee meeting. The prior written notice contained all of the elements required under Title 34 C.F.R. § 300.503(b). (Hr'g Tr. at vol. 4, p. 1,030; Pet'r Ex. 13 at 25 – 27; Resp't Ex. 70 at 772 – 74)

65.     During ARD committee meetings over the 2008-09 school year, the Student's parents inquired several times about the level of signing ability of the Student's STC special education teacher. On those occasions of parental questions about the teacher's signing proficiency, the ARD committee conversation was "redirected" to another topic by the District. (Hr'g Tr. at vol. 3, pp. 798 – 99; Hr'g Tr. at vol. 4, pp. 1,191 – 93)

66.     During the 2008-09 school year, the Student's STC special education teacher sent home with the Student a "Daily School – Home Note." (Hr'g Tr. at vol. 4, pp. 1,167 – 70; Pet'r Ex. 20)

67.     The Student learned and was able to spontaneously sign at least 38 more ASL signs in May, 2009 than in October, 2008. (Hr'g Tr. at vol. 4, pp. 1,145 – 50; Pet'r Ex. 5 at 20; Pet'r Ex. 13 at 2; Resp't Ex. 70 at 750)

68.     The Student's progress on the IEP social skills goal was static over the spring of 2009. The District's progress reports to the parents from March 25, 2009 and June 4, 2009 were identical. Under the progress code each stated "work in

progress." Under general comments each stated: "[The Student] enjoys . . . time with peers and will allow a peer to hold . . . hand but we need to see on a more consistent basis [the Student] allowing a friend to join [the Student] without maladaptive behaviors occuring [sic]." (Pet'r Ex. 15 at 37, 52)

69.  The Student was not toilet trained as of June, 2009. (Pet'r Ex. 26 at 7)

70.  On June 2, 2009, the Student's parent submitted a written request to the District asking for a copy of the Student's education records. (Hr'g Tr. at vol. 1, p. 227; Resp't Ex. 56 at 524)

71.  On June 29, 2009, the District replied to the parents' records request seeking clarification of the scope of records requested and informing the parent of projected fees. The District's special education director invited the parent to make an appointment to inspect and review the Student's education records. The parent responded and declined an appointment because of the anticipated volume of records and inconvenience and indicated agreement to pay fees to obtain the records. (Hr'g Tr. at vol. 1, p. 229; Resp't Ex. 56 at 525, 531 – 32)

72.  On or about July 16, 2009, the District provided the Student's parents an updated estimate of fees for obtaining copies of the Student's education records. (Hr'g Tr. at vol. 1, p. 231; Resp't Ex. 56 at 537 – 38)

73.  On July 20, 2009, the Student's parents confirmed to the District their agreement to pay the fees for obtaining the Student's education records. (Pet'r Ex. 30 at 2 – 3; Resp't Ex. 56 at 539 – 40)

74.  On August 5, 2009, the District notified the Student's parents that copies of the Student's education records were available for pick-up. (Hr'g Tr. at vol. 1, p. 232; Pet'r Ex. 30 at 6; Resp't Ex. 56 at 541)

75.  The Student's parent participated in a "meet the teacher night" at the beginning of the 2009-10 school year.  The parent met the Student's new STC special education teacher for the new school year and the teacher revealed that she was not as fluent in signing as the Student's parent. (Hr'g Tr. at vol. 3, pp. 799 – 801, 848 – 50)

76.  The Student's parents opted not to send the Student to school in the District at the beginning of the 2009-10 school year. (Hr'g Tr. at vol. 1, pp. 262 – 63; Hr'g Tr. at vol. 2, p. 302; Pet'r Ex. 23 at 2; Resp't Ex. 73 at 816; Resp't Ex. 75 at 838)

77.   The Student has been homeschooled since the start of the 2009-10 school year.
      The Student's parents did not inform the District of their intent to obtain
      reimbursement prior to homeschooling the Student. (Hr'g Tr. at vol. 2, pp. 303,
      426; Resp't Ex. 93 at 1,270)

78.   On or about September 1, 2009, the Student's parents submitted to the District a
      request for homebound services for the Student. In support of their request, the
      parents provided a letter from their pediatrician – Dr. Lisa Genecov –
      recommending homebound services. The pediatrician's letter stated in part:
      "[The Student] appears to [sic] experiencing significant stress in the school
      environment, beyond that which is typically seen in children transitioning back to
      school. [The Student's] behavior, communication ability and self help skills
      regress when [the Student] returns to the school setting, and [the Student's]
      current independent [sic] educational plan does not seem to appropriately meet
      [the Student's] needs. [The Student's] parents anticipate severe behavioral
      regression is likely if [the Student] returns to school at the present time. I am
      requesting [the Student] receive homebound instruction based on a medical
      exception." (Hr'g Tr. at vol. , p. ; Pet'r Ex. 22 at 1; Pet'r Ex. 23 at 9; Resp't Ex.
      73 at 820; Resp't Ex. 75 at 833)

79.   The pediatrician's September 1, 2009 letter also stated in part: "Additionally the
      parents and I believe an independent educational evaluation should be performed
      and are requesting the evaluation be approved by the district." (Pet'r Ex. 23 at 9;
      Resp't Ex. 75 at 833)

80.   On September 21, 2009, the District held an ARD committee meeting for the
      Student. The Student's parents were in attendance and participated. Among other
      things, the District reviewed the parental homebound placement request and
      determined that additional information from the pediatrician was necessary to
      consider the request; the homebound request was not approved. The parents
      asked, and the District agreed, that the District would provide its questions for the
      pediatrician in writing and give them to the parents who in turn would forward
      them to the pediatrician. (Hr'g Tr. at vol. 1, pp. 251 – 54; Hr'g Tr. at vol. 3, pp.
      624 – 26; Pet'r Ex. 23 at 1 – 3, 6; Resp't Ex.73 at 815 – 18)

81.   The September 21, 2009 ARD committee also discussed the Student's parents'
      disagreement with the February 27, 2009 reevaluation and September 1, 2009
      request for an IEE at public expense. The District responded that the IEE request
      was under consideration. The parents disagreed with the decisions of the District
      at the ARD committee meeting. (Hr'g Tr. at vol. 1, pp. 251 – 52; Pet'r Ex. 23 at
      1, 6; Resp't Ex.73 at 815, 818)

82.    The September 21, 2009 ARD committee also responded to a question by the Student's parents about the signing ability of an LSSP previously involved in evaluating the Student. (Hr'g Tr. at vol. 3, pp. 650 – 51, 740 – 41)

83.    Before the September 21, 2009 ARD committee meeting concluded, a sign language interpreter present for a parent left. The absence of an interpreter for the remainder of the meeting, however, did not impede the parent's participation. (Hr'g Tr. at vol. 3, pp. 809 – 10)

84.    On September 21, 2009, the District's special education director sent a letter to the Student's parents that acknowledged their request for an IEE at public expense and stated, among other things: ". . . McKinney ISD has chosen to request a due process hearing to prove the appropriateness of its evaluation." (Hr'g Tr. at vol. 1, p. 256; Pet'r Ex. 24 at 1; Resp't Ex. 74 at 822)

85.    On September 25, 2009, the District provided to the Student's parents its letter containing six questions for their pediatrician on the homebound recommendation. The parents raised concerns about the letter's contents and the District prepared a revised letter with its six questions. The pediatrician replied in writing to the District's questions on October 13, 2009. Her response was forwarded to the District by the parents. (Hr'g Tr. at vol. 1, pp. 260 – 61; Pet'r Ex. 25 at 1 – 5; Pet'r Ex. 26 at 1 – 4; Resp't Ex. 75 at 826a, 826, 837 – 38, 845 – 46)

86.    On October 2, 2009, the TEA received the District's request for a due process hearing under the IDEA to attempt to demonstrate the appropriateness of the February 27, 2009 FIE. The District did not supply the Student's parents with a procedural safeguards notice when it filed for this due process hearing with the TEA.

87.    On October 16, 2009, the District received the responses of the Student's pediatrician to its six questions on her homebound placement recommendation. (Pet'r Ex. 26 at 3)

88.    On October 21, 2009, the District's special education director sent an e-mail message to the Student's parent that stated, among other things: "I realize that you are requesting homebound services and that the District does not agree with this request based on the information provided . . . ." (Hr'g Tr. at vol. 1, p. 262; Pet'r Ex. 27 at 1; Resp't Ex. 75 at 827)

89. On or before October 27, 2009, the District automatically withdrew the Student after the Student had failed to attend school since the beginning of the 2009-10 school year. (Hr'g Tr. at vol. 2, pp. 301 – 02; Pet'r Ex. 28 at 1 – 2; Resp't Ex. 75 at 837 – 38)

90. On October 27, 2009, the District's special education director sent a letter to the Student's parent that stated, among other things: "While I do not believe that the additional information provided by Dr. Genecov supports the need for a homebound placement, this is an issue to be determined by [the Student's] ARD committee. The District wants to convene an ARD meeting as soon as possible to review the letter provided by Dr. Genecov." (Hr'g Tr. at vol. 2, p. 301; Pet'r Ex. 28 at 1; Resp't Ex. 75 at 837)

91. On or about October 27, 2009, the District provided a prior written notice to the Student's parents regarding the September 21, 2009 ARD committee meeting and denying a homebound placement for the Student. The prior written notice contained all of the elements required under Title 34 C.F.R. § 300.503(b). (Pet'r Ex. 29 at 1 – 4)

92. The District did not convene any further ARD committee meetings following the September 21, 2009 ARD committee meeting.

93. The Student's parents obtained an independent psychological evaluation at their own expense in January, 2010. The independent school psychologist – Dr. Judy Barnes, Ph.D. – is also a certified educational diagnostician as well as a certified sign language interpreter. Among other things, the independent school psychologist found that the Student's "score is just over the threshold for autism; however, primary problem areas are communication and socialization. [The Student] does not exhibit the severe stereotypical behaviors associated with autism." The independent school psychologist characterized the child as one with borderline to mild "Pervasive Developmental Disorder." The independent school psychologist found that some behaviors of a deaf child may be misconstrued as lack of ability to attend and look at a person when the child is instead relying on peripheral vision. The independent school psychologist found that a signing-rich environment would be appropriate for the Student as the Student needs exposure to deaf peers who sign to aid in the growth of communications skills. The independent school psychologist recommended ESY services during the summer with a break. The independent school psychologist did not recommend an interpreter for the Student. The independent school psychologist stated that an invalid evaluation might result if evaluators of a child who signs do not

themselves sign. (Hr'g Tr. at vol. 2, pp. 420 – 21, 426 – 29, 436 – 40, 449, 457, 467 – 69, 478 – 79; Resp't Ex. 93 at 1,275 – 77)

94.     The independent school psychologist was presented as an expert witness whose qualifications as an expert were not challenged. (Hr'g Tr. at vol. 2, p. 418)

95.     The Student's parents were charged $4,330 for the independent psychological evaluation. (Hr'g Tr. at vol. 2, p. 464 – 65; Resp't Ex. 93 at 1,279)

96.     The Student's parents obtained an independent speech-language evaluation at their own expense in February, 2010.   Among other things, the independent certified speech-language pathologist – Tami Williard – found that the Student communicates using ASL and that the Student's receptive language skills were "significantly below that of age-matched peers both hearing and deaf" but that the Student "was able to show comprehension of information at sentence level." The independent speech-language pathologist found that the Student's expressive language skills were "significantly below that of age-matched peers both hearing and deaf" and that the Student "uses one-word, two-word, and occasional three-word phrases" in sign. The independent speech-language pathologist found that although the Student's sign language was significantly below age-match peers, the Student was teachable in sign language. The independent speech-language pathologist found that the Student does have the ability to look at a signer, attend and focus in the proper environment. (Hr'g Tr. at vol. 4, pp. 882, 887 – 88, 895 – 96, 922; Resp't Ex. 94 at 1,285 – 86)

97.     The independent speech-language pathologist was presented as an expert witness whose qualifications as an expert were not challenged. (Hr'g Tr. at vol. 4, p. 879)

98.     The Student's parents were charged $2,450 for the independent speech-language evaluation. (Hr'g Tr. at vol. 4, pp. 908 – 09; Resp't Ex. 94 at 1,292)

## Discussion

## MCKINNEY ISD CLAIM

In the lead-up to this case, the Petitioner/Counter Respondent reevaluated the Respondent/Counter Petitioner. Following this reevaluation, the Respondent/Counter Petitioner asked the Petitioner/Counter Respondent to provide an IEE at public expense.[4]  In response, the

---

[4] In essence, an IEE is an evaluation of a child with a disability that is performed by a qualified evaluator who is not employed by the school district. 34 C.F.R. § 300.502(a)(3)(i). While parents can have their child evaluated at any

Petitioner/Counter Respondent, instead of providing the IEE, filed this request for a due process hearing – as permitted under the IDEA – to attempt to demonstrate the appropriateness of its reevaluation.[5]

Reevaluations of children with disabilities under the IDEA must be conducted in accordance with a specified process.[6] In general, there are three phases of any IDEA reevaluation: (1) an initial review of existing assessment data; (2) an administration of any needed assessments; and (3) an interpretation of results and determinations of eligibility and educational needs.[7] The administration of any new assessments must occur in compliance with IDEA protocols.[8] Upon the completion of the new data collection step, school districts must assemble a group that includes the child's parents to interpret all of the information and determine the child's eligibility and educational needs in conformity with IDEA procedures.[9] In addition to these federal requirements, there are state evaluation requirements, especially with regard to children with autism, children with hearing or auditory impairments, and children with speech impairments.[10]

Here, the Petitioner/Counter Respondent demonstrated that the initial review of existing assessment data was appropriate.

Here, the Petitioner/Counter Respondent failed to demonstrate by a preponderance of the evidence that the administration of needed assessments was appropriate. First, the Petitioner/Counter Respondent inappropriately administered an assessment. Among other things, the Petitioner/Counter Respondent used the ADOS, an autism assessment. The Respondent/Counter Petitioner's qualified independent evaluator – a licensed school psychologist who is also a certified educational diagnostician as well as a certified sign language interpreter – testified that the ADOS is not supposed to be used in evaluating children who are deaf. The Petitioner/Counter Respondent, therefore, violated the IDEA regulation requiring that assessments be administered according to the instructions provided by the assessment's producer.[11]

Second, even if the utilization of the ADOS was not contrary to its producer's instructions, it was not administered in the Student's mode of communication – sign language. The ADOS, along with another assessment – the VB-MAPP (a communication assessment) –

---

time by an outside evaluator, they may ask the school district to pay for the outside evaluator following a disagreement with an evaluation performed by the district. 34 C.F.R. § 300.502(b)(1).
[5] 34 C.F.R. § 300.502(b)(2)(i).
[6] 34 C.F.R. §§ 300.15, 300.122.
[7] 34 C.F.R. §§ 300.305(a) – (c), 300.306.
[8] 34 C.F.R. § 300.304.
[9] 34 C.F.R. § 300.306.
[10] Tex. Educ. Code § 29.310; 19 Tex. Admin. Code § 89.1040.
[11] 34 C.F.R. § 300.304(c)(1)(v).

were both given by evaluators who could not sign with the Student. The Petitioner/Counter Respondent did not establish that these evaluators had the assistance of either an interpreter or another evaluator who could sign in the administration of these assessments. The Petitioner/Counter Respondent, therefore, violated the Texas Education Code provision requiring assessment "procedures and materials" for children who are deaf or hard of hearing be in the child's "preferred mode of communication."[12] This Hearing Officer interprets this Texas provision to apply to all of the assessment material administered to a deaf child.

Here, the Petitioner/Counter Respondent failed to demonstrate by a preponderance of the evidence that the interpretation of results and determinations on educational needs were appropriate. The Petitioner/Counter Respondent failed to ensure that the test protocols from the reevaluation were documented and saved.[13] The Petitioner/Counter Respondent's lead evaluator testified that no one from the District asked for the protocols so they were destroyed. This Hearing Officer finds that the lack of the test protocols undermines the credibility of the Petitioner/Counter Respondent's reevaluation in light of testimony by the Respondent/Counter Petitioner's expert that had they been available, they would have been examined.[14] The Respondent/Counter Petitioner was thus denied the opportunity to explore whether the District's reevaluation was credible. The Petitioner/Counter Respondent, therefore, violated the IDEA regulation requiring that information obtained from all evaluation sources be documented.[15]

The destruction of the test protocols is also a violation of the IDEA because their loss significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the Student.[16] The underlying issue here is not whether the Student qualifies as a child with "autism" but rather, the source, severity and impact of certain

---

[12] Tex. Educ. Code § 29.310(c). In addition to violating state law, the Petitioner/Counter Respondent did not comply with the IDEA. According to nonregulatory guidance from the U.S. Department of Education, evaluations and reevaluations must be administered in "the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do, unless it is clearly not feasible to so provide or administer." 71 Fed. Reg. 46642 (2006).

[13] A test protocol is the individual child's test booklet with the recording of responses or scores. Hr'g Tr. at vol. 4, pp. 911 - 12.

[14] In contrast to the situation in *W.H. v. Clovis Unified Sch. Dist.*, 51 IDELR 180 (E.D. Calif. 2008), where the judge held that supplementation of the court's record with testing protocol was not necessary when the district's failure to produce testing protocol for a due process hearing was harmless error because there was no challenge to testing results, the Petitioner/Counter Respondent here was reasonably on notice before any assessments were administered for the reevaluation that retention of the test protocols providing the backup to the reevaluation would be appropriate. In this situation the reevaluation schedule was accelerated on account of the parental request for an IEE made in October, 2008. There was also the parental challenge to the last reevaluation made in October, 2008.

[15] 34 C.F.R. § 300.306(c)(1)(ii). The Office for Civil Rights (OCR) of the U.S. Department of Education, in enforcing the parallel provision in the Section 504 regulations requiring that information obtained during a school evaluation of a child with a disability be documented, has held that testing protocols must be retained to ensure parental access to relevant records used in the evaluation. *St. Charles (Ill) Community Sch. Dist. # 303*, 17 IDELR 18 (OCR 1990).

[16] 34 C.F.R. § 300.513(a)(2)(ii).

behaviors. To properly individualize an educational program, it is critical to correctly identify these dimensions of the challenging behaviors of the Student. On the one hand, the District sees the Student as having problems with attending to people and "joint attention" – being able to look at or engage with a person and focus on the same thing.[17] If there is a lack of attending or joint attention as attributes of autism, then the educational program should be developed to address those needs. If instead, as suggested by the parents' private evaluators, any lack of attention or engagement is primarily because of being in an uncomfortable situation or frustrated by not having an opportunity to communicate with others in sign language, then the educational program should be developed to address that need.[18] The parents secured two IEEs at their own expense that generated results and recommendations different from the District's reevaluation regarding the attending and joint attention problems and appropriateness of exposing the Student to a signing-rich learning environment. Without the test protocols, the parents' ability to participate in the process by exploring the accuracy of the District's reevaluation and weighing options central to the direction of the educational program are significantly impeded.

In conclusion, this Hearing Officer finds that the Respondent/Counter Petitioner prevails on the Petitioner/Counter Respondent's claim. Under the IDEA, a parent is only entitled to one IEE at public expense following an evaluation where there is a disagreement.[19] Here, the parents secured a multidisciplinary IEE in two parts in early 2010. This Hearing Officer finds that because the Petitioner/Counter Respondent's reevaluation was not appropriate, the Respondent/Counter Petitioner is entitled to the multidisciplinary IEE, which it already obtained, at public expense.[20]

## S. F. COUNTERCLAIMS

Counterclaim # 1

The Respondent/Counter Petitioner's first counterclaim is that the Petitioner/Counter Respondent failed to devise appropriate IEPs for the Respondent/Counter Petitioner, resulting in a denial of FAPE and harm to the Respondent/Counter Petitioner, significantly impeding the Respondent/Counter Petitioner's and parents' opportunity to participate in the decision-making process and/or causing a deprivation of educational benefits. According to the standard set by the U.S. Supreme Court in *Board of Education v. Rowley*, a school district fails to provide FAPE to a child with a disability under the IDEA if the child's IEP is (1) not compliant with the IDEA procedures, and (2) not reasonably calculated to enable the child to receive educational benefits.[21] Regarding the second prong of the *Rowley* standard, the U.S. Court of Appeals for the

---

[17] Hr'g Tr. at vol. 1, p. 63.
[18] Hr'g Tr. at vol. 1, pp. 467 – 69.
[19] 34 C.F.R. § 300.502(b)(5).
[20] 34 C.F.R. § 300.502(a)(3)(ii).
[21] *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).

Fifth Circuit, in *Cypress-Fairbanks Independent School District v. Michael F.*, announced four factors to consider in deciding whether a child's IEP is reasonably calculated to confer educational benefits: (1) individualized services; (2) placement in the LRE; (3) coordination of key stakeholders; and (4) provision of educational benefits.[22]

The analysis here will focus on each of the *Michael F.* factors as determinative of the outcome of counterclaim no. 1. Procedural compliance will be addressed below under the counterclaims raising procedural defects.

### Individualized Services

Factor 1 under *Michael F.* is whether the child's IEP has been individualized. An IEP is individualized if it includes the goals and programming that respond to the identified special needs of the child. Here, the Petitioner/Counter Respondent omitted an annual goal and objective on toileting skills for the Respondent/Counter Petitioner. The Petitioner/Counter Respondent had previously included toileting skills in the Student's IEP but deleted it in the 2008-09 IEP. The Petitioner/Counter Respondent's February, 2009 reevaluation identified toileting skills as an area of weakness. No IEP amendment, however, was made to address this area. The special education director of the Petitioner/Counter Respondent acknowledged that if this was still an area of need, there should have been an annual goal or objective developed.[23] This Hearing Officer finds that the Petitioner/Counter Respondent should have proposed such a goal or objective; if a doctor's release were needed, it would have been incumbent on the Petitioner/Counter Respondent to bring that to the attention of the parents.

### Least Restrictive Environment

Factor 2 under *Michael F.* is whether the child has been served in the LRE. Compliance with the LRE mandate is evaluated through the two-part test announced by the Fifth Circuit in *Daniel R.R. v. State Board of Education.*[24]

### First Prong of the *Daniel R.R.* Test

The first prong of the *Daniel R.R.* test asks whether full-time education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily. Several factors are considered under the first prong, such as the steps the school has taken to accommodate the student, the sufficiency of these efforts, the ability of the student to receive educational benefit in the regular classroom, the overall experience of the student, and the effect

---

[22] 118 F.3d 245, 253 (5th Cir. 1997), *cert. denied* 522 U.S. 1047 (1998).

[23] Hr'g Tr. at vol. 2, p. 580.

[24] 874 F.2d 1036, 1048 (5th Cir. 1989)

of the student on his or her classmates.[25]  Here, neither the Petitioner/Counter Respondent nor Respondent/Counter Petitioner advocated that the Student be educated in the regular classroom.

### Second Prong of the *Daniel R.R.* Test

Because full-time education in the regular classroom, even with the use of supplementary aids and services, could not be achieved satisfactorily, the analysis turns to the second prong of the *Daniel R.R.* test.  The second prong asks which setting permits the child to be mainstreamed to the maximum extent appropriate.  Here, in determining inclusion to the maximum extent appropriate, the Hearing Officer is mindful of policy guidance from the U.S. Department of Education that states with regard to those children who are deaf, the LRE is a setting that permits appropriate services to be provided and the child's communication needs to be met.[26]  In other words, the LRE framework for a child who is deaf is not solely about exposure to children without disabilities.

In the 2008-09 school year, the STC was not the LRE because it did not provide the Student with peers with whom the Student could communicate directly as required under state law.  In Texas, if practicable and not in conflict with an ARD committee recommendation, a deaf child must have an education in the company of a sufficient number of peers using the same language mode and with whom the child can communicate directly.[27]  The Student's ARD committee selected a self-contained classroom but recommended that the Student's peers be able to communicate with the Student through their acquisition of signing skills.  As implemented, however, the peers were not able to and certainly did not gain signing skills to communicate directly with the Student.  The special education teacher for the STC testified that none of the Student's peers could independently communicate with the Student.[28]    While the Petitioner/Counter Respondent asserts that the STC was the appropriate LRE regardless of the other classmates not having signing ability, controlling Texas law does not qualify its mandate or provide exceptions – if there is no contrary ARD committee recommendation, which there was not in this case, schools must arrange for peers with whom the Student can communicate directly.  In this case, the IEP specified that the Student would have peers to communicate with through sign language.

### Key Stakeholder Coordination

---

[25] 874 F.2d at 1048 – 49.

[26] *Notice of Policy Guidance on Deaf Students Education Services*, 57 Fed. Reg. 49274, 19 IDELR 463A (U.S. Dep't of Educ. 1992).

[27] Tex. Educ. Code § 29.305.

[28] The failure to implement the ARD committee recommendation that peers be trained in basic signs for the benefit of the Student may also be considered a failure to implement a substantial or significant provision of the Student's IEP under *Houston Indep. Sch. Dist. v. Bobby R*, 200 F.3d 341 (5th Cir.), *cert. denied*, 531 U.S. 817 (2000).

Factor 3 under *Michael F.* is whether key stakeholders acted in a coordinated manner. Here, the STC special education teacher and the itinerant deaf education teacher did coordinate their services to the Student.  Though there were disagreements, the parents and the school district maintained communication.

## Educational Benefit

Factor 4 under *Michael F.* is whether the child received educational benefits. Here, there were mixed results. Regarding academic benefits, the Student did learn more signs over the course of the 2008-09 school year. Regarding nonacademic benefits, the Student remained without toileting skills. Social skills deficits can only be presumed to have remained without improvement; the IEP for the second semester of the 2008-09 school year and for the 2009-10 school year did not provide any description of the Student's present levels of achievement and functional performance in the area of social skills although there was a social skills goal. This is perhaps not surprising since the Student did not have classroom peers with whom the Student could communicate in sign language.

In conclusion, this Hearing Officer finds that after weighing the *Michael F.* factors the Respondent/Counter Petitioner prevails on Counterclaim no. 1.   The Petitioner/Counter Respondent failed to devise appropriate IEPs for the Respondent/Counter Petitioner reasonably calculated to confer both academic and nonacademic benefits.

## Counterclaim # 2

The Respondent/Counter Petitioner's second counterclaim is that the Petitioner/Counter Respondent failed to educate the Respondent/Counter Petitioner in the LRE. Per the analysis under Counterclaim no. 1, this Hearing Officer finds that the Respondent/Counter Petitioner was not placed in the LRE.   In conclusion, the Respondent/Counter Petitioner prevails on Counterclaim no. 2.

## Counterclaim # 3

The Respondent/Counter Petitioner's third counterclaim is that the Petitioner/Counter Respondent failed to address the Respondent/Counter Petitioner's communication needs. Per the analysis under Counterclaim no. 1, this Hearing Officer finds that the Respondent/Counter Petitioner was not provided peers with whom the Student could communicate in the preferred mode of communication – sign language.  In conclusion, the Respondent/Counter Petitioner prevails on Counterclaim no. 3.

Counterclaim # 4

The Respondent/Counter Petitioner's fourth counterclaim is that the Petitioner/Counter Respondent failed to allow the parents to participate in the ARD committee process. Under the IDEA, protecting and securing parent involvement is central in the provision of FAPE to children with disabilities. Among other things, schools are required to ensure parents are afforded an opportunity to participate in ARD committee meetings.[29]  Further, there are provisions intended to ensure that parents have the information they need to participate in the educational programming process. For instance, parents must be given a copy of any evaluation and reevaluation reports.[30]  In Texas, parents of children with deafness must be involved in determining the extent and content of their child's program.[31]  The Fifth Circuit, in *White v. Ascension Parish School Board*, indicated that a school district does not satisfy its responsibility for getting parental participation if there is bad faith exclusion of parents or a refusal to listen to and consider input from the parents.[32] Further, under the IDEA, for lack of parental participation to rise to the level of a denial of FAPE, the parent's participation must have been "significantly" impeded.[33]

Here, the parents participated and were actively engaged in the ARD committee process. There were several ARD committee meetings and at least one parent attended each one; one meeting was held at parental request. While an interpreter had to leave one ARD committee meeting before it concluded, a parent testified that parental participation was not impeded. Regarding the Student's special education teachers, although the parents were not able to get answers at ARD committee meetings about their ability to sign with the Student, the parents were able to meet the teachers during school open house sessions and directly question them on their signing proficiency.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 4.

Counterclaim # 5

The Respondent/Counter Petitioner's fifth counterclaim is that the Petitioner/Counter Respondent failed to appropriately consider and address the Respondent/Counter Petitioner's needs using the autism supplement. This Counterclaim duplicates Counterclaims no. 9 and 14 as they are based on specific portions of the Texas autism supplement. Based on Counterclaim no.

---

[29] 34 C.F.R. § 300.322; 19 Tex. Admin. Code § 89.1050(h).
[30] 34 C.F.R. § 300.306(a)(2).
[31] Tex. Educ. Code § 29.306.
[32] 343 F.3d 373, 380 (5th Cir. 2003).
[33] 34 C.F.R. § 300.513(a)(2)(ii). See also *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 – 13 (5th Cir. 2003).

9, this Hearing Officer finds that the Respondent/Counter Petitioner prevails in part on Counterclaim no. 5.

Counterclaim # 6

The Respondent/Counter Petitioner's sixth counterclaim is that the Petitioner/Counter Respondent failed to appropriately and timely arrange a homebound program for the Respondent/Counter Petitioner. Under the IDEA, placement determinations must be made by a group that includes the child's parents in conformity with the LRE mandate.[34]  School districts must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities.[35]  Among these alternative placements is instruction in the home.[36]  In Texas, a child with a disability may only be placed into a homebound placement if specified criteria are met.[37]  A physician must document the child's homebound needs.[38]

Here, the Respondent/Counter Petitioner presented a letter from the Student's pediatrician recommending homebound services.  The Petitioner/Counter Respondent reviewed the doctor's letter at an ARD committee meeting and determined that obtaining additional information would be warranted before granting the request.  The Respondent/Counter Petitioner eventually forwarded some additional information to the Petitioner/Counter Respondent.  The information, however, was not furnished until after the Petitioner/Counter Respondent filed for this due process hearing with the TEA.  The homebound placement was never approved by the Petitioner/Counter Respondent.  The Respondent/Counter Petitioner objects that the recommended homebound services were never provided.

This Hearing Officer finds that the lack of a homebound placement was not a violation of the IDEA on two grounds.  First, in Texas, case law establishes that ARD committees are not obligated to adhere to expert recommendations.  In *Marc V. v. North East Independent School District*,[39] the federal district court stated that an ARD committee may not delegate its duties to develop a program for a child with a disability to an outside expert who prescribes a particular placement.  The ARD committee retains the responsibility to ensure an appropriate IEP and placement in the LRE.  Therefore, the Student's ARD committee did not commit an error by not abiding by the recommendation of the Student's pediatrician; it was within the committee's prerogative to seek additional information.  Second, because of the timing of the homebound request and its pending consideration when the Petitioner/Counter Respondent filed its due process hearing, the "stay-put" rule came into play preserving the status quo – which did not

---

[34] 34 C.F.R. § 300.116(a).

[35] 34 C.F.R. § 300.115(a).

[36] 34 C.F.R. §§ 300.39(a)(1)(i), 300.115(b)(1).

[37] 19 Tex. Admin. Code § 89.63(c)(2).

[38] 19 Tex. Admin. Code § 89.63(c)(2)(A).

[39] 455 F.Supp.2d 577, 594 (W.D. Tex. 2006), *aff'd* 242 Fed.Appx. 271 (5th Cir. 2007).

include a homebound placement. The stay-put rule is a procedural safeguard that applies when a due process hearing is requested. The rule requires that a child with a disability remain in his or her current educational placement during the pendency of the case unless the parents and school district agree otherwise.[40]   With the stay-put rule in effect, the Petitioner/Counter Respondent was not obliged to provide the Student with homebound services unless it agreed. Therefore, the Student's ARD committee did not commit an error by not abiding by the recommendation of the Student's pediatrician.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 6.

## Counterclaim # 7

The Respondent/Counter Petitioner's seventh counterclaim is that the Petitioner/Counter Respondent failed to appropriately address the Respondent/Counter Petitioner's OT needs. Under the IDEA, schools must not only offer special education to a child with a disability, but also any "related service" necessary to assist the child to benefit from special education. OT is considered a related service.[41]  A child's IEP must state not only the special education to be provided to a child but also any needed related services.[42]  The primary aim of OT services is to prevent or mitigate lost or impaired functions that result from illness, injury or deprivation.[43]

Here, the Student had the fine motor skills to sign and complete classroom tasks. This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish by a preponderance of the evidence that the Student had lost or impaired functions that necessitated the delivery of OT services.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 7.

## Counterclaim # 8

The Respondent/Counter Petitioner's eighth counterclaim is that the Petitioner/Counter Respondent failed to assess and address the Respondent/Counter Petitioner's AT needs. Under the IDEA, a child's ARD committee must consider, among other things, whether the child needs AT devices and services.[44]

---

[40] 34 C.F.R. § 300.518(a).
[41] 34 C.F.R. § 300.34(c)(6).
[42] 34 C.F.R. § 300.320(a)(4).
[43] 34 C.F.R. § 300.34(c)(6).
[44] 34 C.F.R. § 300.324(a)(2)(v).  An AT device is a piece of equipment or an item that increases, maintains or improves the child's functional capabilities.  34 C.F.R. § 300.5.

Here, the Student's IEPs for the 2008-09 and 2009-10 school years addressed AT. Further, the Petitioner/Counter Respondent recognized that the Student could benefit from computers and utilized that technology. This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish by a preponderance of the evidence that the Student's need for AT was not considered and addressed.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 8.

Counterclaim # 9

The Respondent/Counter Petitioner's ninth counterclaim is that the Petitioner/Counter Respondent failed to conduct an appropriate FBA and devise and implement an appropriate BIP for the Respondent/Counter Petitioner. Under the TEA regulations implementing the IDEA, school districts must consider and address in the IEPs for children with autism, when needed, "positive behavior support strategies" based on relevant information.[45] One means identified in the TEA regulations for complying with this provision is the furnishing of a BIP "developed from a 'Functional Behavioral Assessment' that uses current data related to target behaviors."[46]

Here, the Student's BIPs, among other things, permitted the Student to be disciplined in accordance with the student code of conduct. Both the special education director and a behavior analyst for the Petitioner/Counter Respondent, however, conceded that the Student was not capable of following the student code of conduct. Therefore, the BIPs were inappropriate.

In conclusion, this Hearing Officer finds that the Respondent/Counter Petitioner prevails on Counterclaim no. 9.

Counterclaim # 10

The Respondent/Counter Petitioner's tenth counterclaim is that the Petitioner/Counter Respondent failed to timely respond to the parents' records requests. Under the IDEA, parents may ask to inspect and review their child's education records and receive an explanation and interpretation of the records.[47] A school district must respond to such a request "without unnecessary delay" but no later than 45 days after the request was made.[48] Parents may also

---

[45] 19 Tex. Admin. Code § 89.1055(e)(4). In Texas, the consideration of these and other strategies for children with autism are typically addressed in the "autism supplement" to the IEP.

[46] 19 Tex. Admin. Code § 89.1055(e)(4)(B).

[47] 34 C.F.R. §§ 300.613(a) – (b)(1).

[48] 34 C.F.R. § 300.613(a).

request that the district provide a copy of their child's education records.[49] If parents request a copy of the records, the IDEA permits the district to charge a copying fee as long as the fee does not "effectively prevent" the parents from exercising their right to access their child's records.[50] The U.S. Department of Education regulations implementing IDEA do not specify a deadline for responses to requests for copies of records. This Hearing Officer would interpret these provisions, however, to require that copies be made available within 45 days of the request if having the copies was the only effective means for parents to access the records.

Here, the parents submitted two requests for copies of the Student's education records. One was made in June of 2008.[51] This Hearing Officer finds that any complaint about this records request is barred by the Texas one-year statute of limitations.[52] If the Respondent/Counter Petitioner had a complaint about the Petitioner/Counter Respondent's response, or lack of one, it should have been made within a year of the submission of this copy request in June, 2008 as that is when any claim accrued because the Respondent/Counter Petitioner was then aware of and exercised the parental right to request copies of education records.

The second request for copies of the Student's education records was made in June of 2009. The district made an offer to the parents to have a meeting to inspect and review them but the parents declined. Copies were produced at the beginning of August of 2009. This Hearing Officer does not find any violation of the IDEA under these circumstances. Obtaining the copies was not the sole means for the parents to access the records; while perhaps inconvenient, the parents could have had an in-person look at them.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 10.

## Counterclaim # 11 – October, 2008 IEE Request

The Respondent/Counter Petitioner's eleventh counterclaim is that the Petitioner/Counter Respondent failed to timely respond to the parents' IEE request made in October of 2008. This counterclaim does not concern the subsequent parental demand for an IEE that triggered the Petitioner/Counter Respondent's request for this due process hearing. With regard to IEEs provided by school districts at no cost to the parents, the implementing IDEA regulation at 34 C.F.R. § 300.502(b) states in relevant part:

"(b) *Parent right to evaluation at public expense.*

---

[49] 34 C.F.R. § 300.613(b)(2).

[50] 34 C.F.R. § 300.617(a).

[51] Hr'g Tr. at vol. 1, p. 195.

[52] 19 Tex. Admin. Code § 89.1151(c).

(1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either—

(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria."[53]

Here, the Respondent/Counter Petitioner argues that once the parent raised its IEE demand in October, 2008, the Petitioner/Counter Respondent should have either timely filed a due process hearing request or provided the IEE. This Hearing Officer finds that the Petitioner/Counter Respondent was not obligated to respond to the October, 2008 IEE request. The Student could not have been entitled to an IEE at public expense from McKinney ISD because it was not the public agency that had obtained the challenged reevaluation. In October, 2008, the parental disagreement was with an old reevaluation performed by a different school district – Plano ISD. Further, the October, 2008 IEE request that came within the statute of limitations period was made after the Petitioner/Counter Respondent's determination that a reevaluation of the Student was warranted and initiation of the reevaluation process. Thus, McKinney ISD had not yet obtained a completed reevaluation report that the Student could dispute.

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 11.

Counterclaim # 12

The Respondent/Counter Petitioner's twelfth counterclaim is that the Petitioner/Counter Respondent failed to offer appropriate transportation services for the Respondent/Counter Petitioner. Under the IDEA, schools must not only offer special education to a child with a disability, but also any "related service" necessary to assist the child to benefit from special education. Transportation is considered a related service.[54] A child's IEP must state not only the special education to be provided to a child but also any needed related services.[55]

---

[53] 34 C.F.R. §§ 300.502(b)(1) – (2).
[54] 34 C.F.R. § 300.34(c)(16).
[55] 34 C.F.R. § 300.320(a)(4).

Here, the ARD committee identified transportation as a necessary related service for the Respondent/Counter Petitioner. This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish by a preponderance of the evidence that during the statute of limitations period, there was any problem with the special bus that carried the Respondent/Counter Petitioner to and from school.[56]

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 12.

Counterclaim # 13

The Respondent/Counter Petitioner's thirteenth counterclaim is that the Petitioner/Counter Respondent failed to provide prior written notice to the parents. Under the IDEA, school districts must timely alert parents of children with disabilities in writing in a wide variety of situations to ensure their knowledge of, and participation in, their child's education. Schools must provide a written notice to the parents of a child with a disability each time it either proposes to, or refuses to, initiate or change the identification, evaluation, educational placement or provision of FAPE.[57] Schools must provide a written notice to the parents of a child with a disability each time they decides that "personally identifiable information" collected or used in the provision of educational services is no longer needed.[58]

Here, the Petitioner/Counter Respondent did not inform the Respondent/Counter Petitioner that test protocols collected and used in the reevaluation of the Student were no longer needed and would be destroyed. The Family Policy Compliance Office (FPCO) of the U.S. Department of Education, in providing technical assistance to another Texas school district, has held that testing protocols that are personally identifiable to a student qualify as an education record under the Family Educational Rights and Privacy Act and the IDEA. Under the destruction of records regulation of the IDEA – 34 C.F.R. § 300.624 – such testing protocols cannot be destroyed without prior notice to the parents.[59] The Petitioner/Counter Respondent, therefore, committed a procedural violation. This Hearing Officer finds that this procedural violation – failure to provide notice regarding no further need for and destruction of the test protocols – significantly impeded the parents' opportunity to participate in the decision-making

---

[56] The Respondent/Counter Petitioner stated in its written closing argument that it was withdrawing this counterclaim. Resp't/Counter Pet'r's Closing Brief at 37. In Texas, however, the Texas Rules of Civil Procedure apply in IDEA due process hearings. 19 Tex. Admin. Code § 89.1185(d). Under Tex. R. Civ. P. 162, it is too late in the case for the Respondent/Counter Petitioner to non-suit this counterclaim as it has already introduced all its evidence in this action.

[57] 34 C.F.R. § 300.503(a).

[58] 34 C.F.R. § 300.624(a). Personally identifiable information includes, for instance, information that contains the child's name or other information that would make it possible to identify the child with reasonable certainty. 34 C.F.R. § 300.32.

[59] *Letter to Mathews*, 105 LRP 58483, 9 FAB 4 (FPCO 2005).

McKinney ISD v. S. F., b/n/f S. and S. F.
No. 026-SE-1009
Final Decision
Page 35 of 50

process regarding the provision of FAPE to the Student.[60]  The parents disagreed with the reevaluation and had the protocols been available, their experts would have examined them in challenging the reevaluation.

In conclusion, this Hearing Officer finds that the Respondent/Counter Petitioner prevails on Counterclaim no. 13.

Counterclaim # 14

The  Respondent/Counter  Petitioner's  fourteenth  counterclaim  is  that  the Petitioner/Counter Respondent failed to provide appropriate ESY services, parent training, in-home training and parent counseling services.  Regarding ESY, under the TEA regulations implementing the IDEA, school districts must consider and address in the IEPs for children with autism, when needed, "extended educational programming."[61]  One means identified in the TEA regulations for complying with this provision is the furnishing of "extended school year services."[62]  In Texas, the need for, and provision of, ESY services is governed by both a state rule[63] and the federal IDEA regulation.[64]

Here, the Respondent/Counter Petitioner disputes ESY services regarding the summers of 2008 and 2009. This Hearing Officer finds that any complaint over 2008 ESY services is barred by the Texas one-year statute of limitations.[65]  If the Respondent/Counter Petitioner had a complaint about the provision of ESY in the summer of 2008, it should have been made no later than the summer of 2009 because any claim accrued in the summer of 2008 as by then the Respondent/Counter Petitioner was aware of ESY services and the Student's eligibility for them.

The Petitioner/Counter Respondent proposed ESY services for the summer of 2009. The parents turned the proposal down because they did not believe it included enough AI services for the Student.  While the intensity of AI services – as measured by the ratio of minutes of AI services to the total minutes in the instructional week – would have diminished from the 2008-09 school year to summer 2009, this Hearing Officer finds that the Respondent/Counter Petitioner failed to establish that the amount of AI services that would have been provided would not have been sufficient to avoid severe or substantial regression in critical skills. For instance, when one of the Respondent/Counter Petitioner's experts was asked if the Student needed the same

---

[60] 34 C.F.R. § 300.513(a)(2)(ii).
[61] 19 Tex. Admin. Code § 89.1055(e)(1).
[62] Id.
[63] 19 Tex. Admin. Code § 89.1065.
[64] 34 C.F.R. § 300.106.
[65] 19 Tex. Admin. Code § 89.1151(c).

intensity of services on an extended educational programming basis, the expert was less than certain – replying "possibly."[66]

Regarding parent training, under the TEA regulations implementing the IDEA, school districts must consider and address in the IEPs for children with autism, when needed, "parent/family training and support."[67]

Here, the Petitioner/Counter Respondent offered parent training. The parents turned it down because they did not agree with the training offered. This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish that the training offered would not have met their needs in light of the parents' never requesting alternative training.

Regarding in-home training, under the TEA regulations implementing the IDEA, school districts must consider and address in the IEPs for children with autism, when needed, "in-home and community-based training or viable alternatives that assist the student with acquisition of social/behavioral skills."[68]

Here, the Petitioner/Counter Respondent determined that in-home training was not needed. This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish that in-home training was inappropriately denied in light of the testimony of the parent that if offered, the parents would not have accepted in-home training.

Regarding parent counseling, the IDEA recognizes it as a related service that should be provided if needed for a child with a disability to benefit from special education.[69] This Hearing Officer finds that the Respondent/Counter Petitioner failed to establish that parent counseling was inappropriately denied in light of the testimony of the parent that the family "never really considered that as a need yet."[70]

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 14.

Counterclaim # 15

The Respondent/Counter Petitioner's fifteenth counterclaim is that the Petitioner/Counter Respondent failed to consider and use methods of instruction based on peer-reviewed research for the Respondent/Counter Petitioner. Under the IDEA, the IEP for a child with a disability

---

[66] Hr'g Tr. at vol. 2, p. 426.
[67] 19 Tex. Admin. Code § 89.1055(e)(6).
[68] 19 Tex. Admin. Code § 89.1055(e)(3).
[69] 34 C.F.R. § 300.34(c)(8).
[70] Hr'g Tr. at vol. 3, p. 723.

must include, among other things, the necessary special education, related services and supplementary aids and services to be provided to the child. To the extent practicable, they must be based on "peer-reviewed research."[71]

Here, an educational diagnostician for the Petitioner/Counter Respondent testified that the school district used strategies based on peer-reviewed research in educating the Student in the STC placement. For the Respondent/Counter Petitioner to prevail on this issue, it must satisfy its burden as the party bringing this counterclaim that that was not true. While one of the Respondent/Counter Petitioner's experts testified about methods of instruction based on peer-reviewed research for children such as this Student that the school district was not employing, that did not establish that the Petitioner/Counter Respondent's approach was not grounded in peer-reviewed research.[72]

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 15.

Counterclaim # 16

The Respondent/Counter Petitioner's sixteenth counterclaim is that the Petitioner/Counter Respondent failed to provide the procedural safeguards notice to the parents. A notice of procedural safeguards provides parents a full explanation of their rights under the IDEA.[73] Among the occasions when a school district must provide it to parents is upon the first due process complaint requesting a due process hearing in a school year.[74]

In this case, the Petitioner/Counter Respondent did not supply the Respondent/Counter Petitioner with a procedural safeguards notice when it filed for a due process hearing with the TEA. This Hearing Officer finds that this is a procedural violation. Under the IDEA, however, a procedural violation alone is insufficient for a determination against the Petitioner/Counter Respondent. A procedural violation may only result in a finding against the Petitioner/Counter Respondent if it either: (1) impeded the Student's right to FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding FAPE; or (3) caused a deprivation of educational benefit.[75] This Hearing Officer finds that none of these conditions occurred here. Most important, in earlier ARD committee meetings the parents either had a procedural safeguards notice provided to them or they declined it.

---

[71] 34 C.F.R. § 300.320(a)(4).
[72] Hr'g Tr. at vol. 4, pp. 900 – 02.
[73] 34 C.F.R. §§ 300.504(c)-(d).
[74] 34 C.F.R. § 300.504(a)(2).
[75] 34 C.F.R. § 300.513(a)(2).

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 16.

Counterclaim # 17

The Respondent/Counter Petitioner's seventeenth counterclaim is that the Petitioner/Counter Respondent failed to devise appropriate measurable annual goals and objectives based on present levels of academic achievement and functional performance for the Respondent/Counter Petitioner. Per the discussion under Counterclaim no. 1 regarding a lack of a goal or objective on toileting skills, the Respondent/Counter Petitioner prevails on Counterclaim no. 17.

Counterclaim # 18

The Respondent/Counter Petitioner's eighteenth counterclaim is that the Petitioner/Counter Respondent incurred, as a result of the alleged violations of the IDEA, the obligation to cover and reimburse the parents for privately secured services provided to the Respondent/Counter Petitioner. Under the IDEA, reimbursement for home schooling, evaluation, therapy and other costs is possible under specified conditions.[76] Procedurally, parents generally must demonstrate that they provided advance notice to the school district before removing the child for private instruction.[77] Substantively, parents must demonstrate that they have satisfied a two-part test: first, showing that the school district cannot offer an appropriate education to the child and, second, showing that the private instruction did so.[78]

Here, the Respondent/Counter Petitioner did not comply with the notice provisions for a reimbursement request. Under the IDEA, a party may provide notice in one of two ways. Notice provided through an ARD committee meeting must occur before the child is removed.[79] Notice provided through a notice letter must occur at least 10 business days before the child is removed.[80] Regardless of the manner of notice, the party desiring reimbursement must (1) inform the ARD committee that it is rejecting the placement proposed by the school district; (2) state its concerns; and (3) state its intent to enroll the child in private school at public expense.[81] The Student's parents did not state their intent to home school the Student at public expense before beginning home schooling.

---

[76] 34 C.F.R. § 300.148.
[77] 34 C.F.R. § 300.148(d)(1).
[78] 34 C.F.R. § 300.148(c).
[79] 34 C.F.R. § 300.148(d)(1)(i).
[80] 34 C.F.R. § 300.148(d)(1)(ii).
[81] 34 C.F.R. § 300.148(d)(1)(i).

In conclusion, this Hearing Officer finds that the Petitioner/Counter Respondent prevails on Counterclaim no. 18.

## Conclusions of Law

After due consideration of the foregoing findings of fact, this Hearing Officer makes the following conclusions of law:

1. The Petitioner/Counter Respondent, McKinney Independent School District, inappropriately evaluated the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.303 – 300.306; Tex. Educ. Code § 29.310. The Respondent/Counter Petitioner, S. F., is entitled to reimbursement for the independent educational evaluations obtained by the parents under 34 C.F.R. § 300.502.

2. The Petitioner/Counter Respondent, McKinney Independent School District, failed to devise appropriate IEPs for the Respondent/Counter Petitioner, S. F., under 34 C.F.R. § 300.101; *Board of Educ. v. Rowley*, 458 U.S. 176 (1982); *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245 (5th Cir. 1997), *cert. denied* 522 U.S. 1047 (1998); and *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341 (5th Cir.), *cert. denied* 531 U.S. 817 (2000).

3. The Petitioner/Counter Respondent, McKinney Independent School District, failed to educate the Respondent/Counter Petitioner, S. F., in the LRE under 34 C.F.R. § 300.114 and *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir. 1989).

4. The Petitioner/Counter Respondent, McKinney Independent School District, failed to address the communication needs of the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.324(a)(2)(iv), 300.324(b)(2); Tex. Educ. Code § 29.305.

5. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to allow the parents of the Respondent/Counter Petitioner, S. F., to participate in the ARD committee process under 34 C.F.R. §§ 300.322, 300.513; Tex. Educ. Code § 29.306; 19 Tex. Admin. Code § 89.1050(h); *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 – 13 (5th Cir. 2003); *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003).

6. The Petitioner/Counter Respondent, McKinney Independent School District, failed in part to appropriately consider and address the needs of the Respondent/Counter Petitioner, S. F., using the autism supplement under 19 Tex. Admin. Code §§ 89.1055(e) – (f).

7. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to appropriately and timely arrange a homebound program for the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.115, 300.116; 19 Tex. Admin. Code § 89.63(c)(2) and *Marc V. v. North East Indep. Sch. Dist.*, 455 F.Supp.2d 577 (W.D. Tex. 2006), *aff'd* 242 Fed.Appx. 271 (5th Cir. 2007).

8. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to appropriately address the OT needs of the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.34, 300.320(a)(4), 300.324(a)(1)(iv).

9. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to assess and address the AT needs of the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.105, 300. 324(a)(2)(v), 300.324(b)(2).

10. The Petitioner/Counter Respondent, McKinney Independent School District, failed to devise and implement an appropriate BIP for the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.324(a)(2)(i), 300.324(b)(2); 19 Tex. Admin. Code § 89.1055(e)(4)(B).

11. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to timely respond to the records requests of the parents of the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.501(a), 300.613.

12. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to respond to the October, 2008 IEE request of the parents of the Respondent/Counter Petitioner, S. F., under 34 C.F.R. § 300.502.

13. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to offer appropriate transportation services to the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.34, 300.320(a)(4).

14. The Petitioner/Counter Respondent, McKinney Independent School District, failed to provide prior written notice to the parents of the Respondent/Counter Petitioner, S. F., and this failure significantly impeded the parents' opportunity to participate in the decision-making process under 34 C.F.R. §§ 300.513, 300.624; *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 – 13 (5th Cir. 2003).

15. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to provide appropriate ESY services, parent training, in-home training and parent counseling services to the Respondent/Counter Petitioner, S. F., under 34 C.F.R. § 300.106; 19 Tex. Admin. Code §§ 89.1055(e) – (f), 89.1065.

16. The Petitioner/Counter Respondent, McKinney Independent School District, did not fail to consider and use methods of instruction based on peer-reviewed research to the extent practicable for the Respondent/Counter Petitioner, S. F., under 34 C.F.R. § 300.320(a)(4).

17. The Petitioner/Counter Respondent, McKinney Independent School District, failed to provide the procedural safeguards notice to the parents of the Respondent/Counter Petitioner, S. F. under 34 C.F.R. § 300.504. This procedural violation, however, did not deny the receipt of FAPE under 34 C.F.R. § 300.513 and *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 – 13 (5th Cir. 2003).

18. The Petitioner/Counter Respondent, McKinney Independent School District, failed to devise appropriate measurable annual goals and objectives based on present levels of academic achievement and functional performance for the Respondent/Counter Petitioner, S. F., under 34 C.F.R. §§ 300.320(a)(1) – (2).

19. The Petitioner/Counter Respondent, McKinney Independent School District, has not incurred an obligation to cover and reimburse the parents for privately secured services provided to the Respondent/Counter Petitioner, S. F., under 34 C.F.R. § 300.148.

### Order

Based upon the foregoing findings of fact and conclusions of law,

**IT IS HEREBY ORDERED THAT**:

1. The relief sought by the Petitioner/Counter Respondent shall be and is **DENIED**. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED**. To wit, the Petitioner/Counter Respondent shall provide compensatory reimbursement to the Respondent/Counter Petitioner in the amount of $6,780.00 for the independent educational evaluations obtained by the Respondent/Counter Petitioner. This order for reimbursement of the Respondent/Counter Petitioner is stayed if a civil action is initiated in a court of competent jurisdiction to appeal the decision on this claim.

2. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED**. To wit, the Petitioner/Counter Respondent shall, if the Respondent/Counter Petitioner is currently a resident of the McKinney Independent School District, propose for the

2010-11 school year and be prepared to provide an IEP that includes an appropriate measurable annual goal/objective for toileting skills.

3. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED**. To wit, the Petitioner/Counter Respondent shall, if the Respondent/Counter Petitioner is currently a resident of the McKinney Independent School District, propose and be prepared to provide an ESY program of direct one-on-one AI services to the Respondent/Counter Petitioner. Unless an ARD committee mutually agrees otherwise, this ESY program shall be initiated as soon as practicable following the 2009-10 school year. During the course of the ESY program, the Petitioner/Counter Respondent shall provide any necessary special transportation and shall ascertain the Respondent/Counter Petitioner's present levels of academic achievement and functional performance for presentation to an ARD committee for the Respondent/Counter Petitioner.

4. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED**. To wit, the Petitioner/Counter Respondent shall revise the IEP and BIP of the Respondent/Counter Petitioner and no longer subject the Respondent/Counter Petitioner to the student code of conduct, unless an ARD committee mutually agrees otherwise.

5. The relief sought by the Respondent/Counter Petitioner shall be and is **GRANTED**. To wit, the Petitioner/Counter Respondent shall review with and train personnel serving the Respondent/Counter Petitioner in the IDEA requirements pertaining to notice to parents of children with disabilities. The Petitioner/Counter Respondent shall develop and implement such administrative procedures as necessary to ensure required notices are timely provided to the parents.

6. The Petitioner/Counter Respondent shall timely implement this Final Decision within 10 school days in accordance with 19 Tex. Admin. Code § 89.1185(p) and 34 C.F.R. § 300.518. The Petitioner/Counter Respondent must provide the following to the Division of Complaints Management at the Texas Education Agency and the Petitioner within 15 school days from the date of this Final Decision: (1) documentation demonstrating that the Final Decision has been implemented or (2) if the timeline set by the Hearing Officer for implementing certain aspects of the Final Decision is longer than 10 school days, the Petitioner/Counter Respondent's plan for implementing the Final Decision within the prescribed timeline and a signed assurance from the superintendent that the Decision will be implemented.

**SIGNED** this _____ day of May, 2010.

_____
Steven R. Aleman
Special Education Hearing Officer

## Notice

Any party aggrieved by the findings and decision of this Hearing Officer has the right to bring a civil action seeking review in a state or federal court of competent jurisdiction. The party bringing the civil action shall have no more than 90 days from the date of this Decision to file the civil action. 20 U.S.C. § 1415(i)(2), as amended.

## TEA DOCKET NO. 026-SE-1009

| | | |
|---|---|---|
| MCKINNEY | § | |
| INDEPENDENT SCHOOL DISTRICT | § | BEFORE A |
|     Petitioner/Counter Respondent | § | SPECIAL EDUCATION |
| | § | |
| v. | § | HEARING OFFICER |
| | § | |
| S. F., | § | FOR THE |
| b/n/f S. and S. F. | § | STATE OF TEXAS |
|     Respondent/Counter Petitioner | § | |

### SYNOPSIS

CLAIM 1:  Whether the Petitioner/Counter Respondent's full and individual reevaluation of the Respondent/Counter Petitioner was appropriate.

CITE:  34 C.F.R. §§ 300.303 – 300.306; Tex. Educ. Code § 29.310; 19 Tex. Admin. Code §§ 89.1040(b), (c)(1), (c)(3), (c)(10)

HELD:  For the Respondent/Counter Petitioner. The Petitioner/Counter Respondent's reevaluation was inappropriate because it administered an assessment not recommended for a deaf student, it did not administer all assessments in the child's mode of communication, and it allowed destruction of test protocols so reported results could not be verified.

COUNTER-
CLAIM 1:  Whether the Petitioner/Counter Respondent failed to devise appropriate IEPs for the Respondent/Counter Petitioner, resulting in a denial of FAPE and harm to the Respondent/Counter Petitioner, significantly impeding the Respondent/Counter Petitioner's and parents' opportunity to participate in the decision-making process and/or causing a deprivation of educational benefits.

CITE:  34 C.F.R. § 300.101

HELD:  For the Respondent/Counter Petitioner. The IEPs were not reasonable calculated to confer both academic and nonacademic educational benefits.

COUNTER-
CLAIM 2:  Whether the Petitioner/Counter Respondent failed to educate the Respondent/Counter Petitioner in the LRE.

CITE:          34 C.F.R. § 300.114

HELD:          For the Respondent/Counter Petitioner.  As implemented by the
               Petitioner/Counter Respondent, the STC was not the LRE for the
               Respondent/Counter Petitioner.

COUNTER-
CLAIM 3:       Whether the Petitioner/Counter Respondent failed to address the
               Respondent/Counter Petitioner's communication needs.

CITE:          34 C.F.R. §§ 300.324(a)(2)(iv), 300.324(b)(2); Tex. Educ. Code § 29.305

HELD:          For the Respondent/Counter Petitioner.  The Petitioner/Counter Respondent
               planned that the Respondent/Counter Petitioner would have peers to communicate
               with using signs but the peers could not independently communicate with the
               Respondent/Counter Petitioner.

COUNTER-
CLAIM 4:       Whether the Petitioner/Counter Respondent failed to allow the parents to
               participate in the ARD committee process.

CITE:          34 C.F.R. § 300.322; Tex. Educ. Code § 29.306; 19 Tex. Admin. Code §
               89.1050(h)

HELD:          For the Petitioner/Counter Respondent.  The parents were involved in determining
               the Respondent/Counter Petitioner's program and allowed to be heard in ARD
               committee meetings.

COUNTER-
CLAIM 5:       Whether the Petitioner/Counter Respondent failed to appropriately consider and
               address the Respondent/Counter Petitioner's needs using the autism supplement.

CITE:          19 Tex. Admin. Code §§ 89.1055(e) – (f)

HELD:          For the Respondent/Counter Petitioner in part.  See counterclaim no. 9.

COUNTER-
CLAIM 6:       Whether the Petitioner/Counter Respondent failed to appropriately and timely
               arrange a homebound program for the Respondent/Counter Petitioner.

McKinney ISD v. S. F., b/n/f S. and S. F.
No. 026-SE-1009
Final Decision
Page **46 of 50**

CITE: 34 C.F.R. §§ 300.115, 300.116; 19 Tex. Admin. Code § 89.63(c)(2)

HELD: For the Petitioner/Counter Respondent. The Petitioner/Counter Respondent was not required to follow the Student's doctor's homebound recommendation and was within its prerogative to request clarifying information.

COUNTER-
CLAIM 7: Whether the Petitioner/Counter Respondent failed to appropriately address the Respondent/Counter Petitioner's OT needs.

CITE: 34 C.F.R. §§ 300.34, 300.320(a)(4), 300.324(a)(1)(iv)

HELD: For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner failed to establish by a preponderance of the evidence that the Petitioner/Counter Respondent failed to address OT needs of the Respondent/Counter Petitioner.

COUNTER-
CLAIM 8: Whether the Petitioner/Counter Respondent failed to assess and address the Respondent/Counter Petitioner's AT needs.

CITE: 34 C.F.R. §§ 300.105, 300. 324(a)(2)(v), 300.324(b)(2)

HELD: For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner failed to establish by a preponderance of the evidence that the Petitioner/Counter Respondent failed to assess and address AT needs of the Respondent/Counter Petitioner.

COUNTER-
CLAIM 9: Whether the Petitioner/Counter Respondent failed to conduct an appropriate FBA and devise and implement an appropriate BIP for the Respondent/Counter Petitioner.

CITE: 34 C.F.R. §§ 300.303, 300.324(a)(2)(i), 300.324(b)(2); 19 Tex. Admin. Code § 89.1055(e)(4)(B)

HELD: For the Respondent/Counter Petitioner. The Petitioner/Counter Respondent inappropriately subjected the Respondent/Counter Petitioner to the District's student code of conduct in the BIP.

COUNTER-

McKinney ISD v. S. F., b/n/f S. and S. F.
No. 026-SE-1009
Final Decision
Page 47 of 50

CLAIM 10:   Whether the Petitioner/Counter Respondent failed to timely respond to the
parents' records requests.

CITE:       34 C.F.R. §§ 300.501(a), 300.613

HELD:       For the Petitioner/Counter Respondent. The Petitioner/Counter Respondent
timely produced copies of education records to the Respondent/Counter
Petitioner.

COUNTER-
CLAIM 11:   Whether the Petitioner/Counter Respondent failed to timely respond to the
parents' IEE request.

CITE:       34 C.F.R. § 300.502

HELD:       For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner was
not entitled to an IEE in October, 2008 because the challenged reevaluation was
obtained by a different school district. Further, the IEE request made within the
statute of limitations period came after the Petitioner/Counter Respondent's
determination that a reevaluation of the child was warranted and initiation of the
reevaluation process.

COUNTER-
CLAIM 12:   Whether the Petitioner/Counter Respondent failed to offer appropriate
transportation services for the Respondent/Counter Petitioner.

CITE:       34 C.F.R. §§ 300.34, 300.320(a)(4)

HELD:       For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner failed
to establish by a preponderance of the evidence that the Petitioner/Counter
Respondent failed to provide special busing for the child.

COUNTER-
CLAIM 13:   Whether the Petitioner/Counter Respondent failed to provide prior written notice
to the parents.

CITE:       34 C.F.R. §§ 300.503, 300.624

HELD:       For the Respondent/Counter Petitioner. The Petitioner/Counter Respondent failed
to provide required notice prior to the destruction of test protocols. This failure
significantly impeded parental participation in decision-making process.

COUNTER-
CLAIM 14:    Whether the Petitioner/Counter Respondent failed to provide appropriate ESY
             services, parent training, in-home training and parent counseling services.

CITE:        34 C.F.R. § 300.106; 19 Tex. Admin. Code §§ 89.1055(e) – (f), 89.1065

HELD:        For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner failed
             to establish by a preponderance of the evidence that the Petitioner/Counter
             Petitioner failed to make available ESY services, parent training, in-home training
             and parent counseling.

COUNTER-
CLAIM 15:    Whether the Petitioner/Counter Respondent failed to consider and use methods of
             instruction based on peer-reviewed research for the Respondent/Counter
             Petitioner.

CITE:        34 C.F.R. § 300.320(a)(4)

HELD:        For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner failed
             to establish by a preponderance of the evidence that the special education
             provided to the Respondent/Counter Petitioner was not based on peer-reviewed
             research to the extent practicable.

COUNTER-
CLAIM 16:    Whether the Petitioner/Counter Respondent failed to provide the procedural
             safeguards notice to the parents.

CITE:        34 C.F.R. §§ 300.504, 300.513

HELD:        For the Petitioner/Counter Respondent. Although the Petitioner/Counter
             Respondent failed to provide a procedural safeguards notice on a required
             occasion, this procedural violation did not deny the Respondent/Counter
             Petitioner FAPE as the parents had earlier access to the notice but declined
             receipt.

COUNTER-
CLAIM 17:    Whether the Petitioner/Counter Respondent failed to devise appropriate
             measurable annual goals and objectives based on present levels of academic
             achievement and functional performance for the Respondent/Counter Petitioner.

CITE:       34 C.F.R. §§ 300.320(a)(1) – (2)

HELD:       For the Respondent/Counter Petitioner. IEP lacked necessary goal/objective as
            identified in reevaluation.

COUNTER-
CLAIM 18:   Whether the Petitioner/Counter Respondent incurred, as a result of the alleged
            violations of the IDEA, the obligation to cover and reimburse the parents for
            privately secured services provided to the Respondent/Counter Petitioner.

CITE:       34 C.F.R. § 300.148

HELD:       For the Petitioner/Counter Respondent. The Respondent/Counter Petitioner did
            not provide advanced notice to the Petitioner/Counter Petitioner of its intent to
            seek reimbursement prior to home schooling.